GRACE HUMISTON, Respondent, v. UNIVERSAL FILM MANU-
FACTURING COMPANY and UNIVERSAL FILM EXCHANGE OF
NEW YORK, INC., Appellants.

First Department, November 21, 1919.

Civil rights — publication of portrait in moving picture news film —
publication in posters announcing subjects of current interest
exhibited by film — sections 50 and 51 of Civil Rights Law
construed.

The primary object of the Legislature in passing sections 50 and 51 of the
Civil Rights Law was to prevent the use of a person's name or portrait
for advertising purposes or for the purposes of trade without first having
obtained his written consent.

While the publication of moving pictures of current events may be classed
as a trade it is not such a trade as was within the contemplation of the
Legislature in the passage of the statute.

Neither the manufacturer of motion picture films of current events and
news items nor the distributor of such films is liable, under section 51
of the Civil Rights Law, for the publication of the portrait of a person
who was engaged in work of current interest at the time the picture was
taken and which represents a truthful picture taken of a current event
at the time that it happened.

The presentation of current events in a motion picture film, accompanied
by proper captions or explanatory reading matter prefacing the pre-
sentation of the subject portrayed, is in no wise different from the pre-
sentation of the same current events through the medium of a newspaper,
and it matters not what may be the motive in the publishing of said
films, whether instructive or whether to satisfy the morbid curiosity
of the public.

When the right to an injunction and to damages is based upon an act made
criminal by the same statute, the law of strict construction applies and
in case of doubt the court will interpret the statute in favor of the party
charged with the crime.

The use of a person's name or picture in the approach to a theatre and
upon the billboards in front as advertising or indicating what was to
appear upon the screen within the building is incidental to the exhibition
of the film itself, and is not a use of the picture or name for advertising
purposes within the meaning of the statute.

CLARKE, P. J., and DOWLING, J., dissented in part.

APPEAL by the defendants, Universal Film Manufacturing
Company and another, from an interlocutory judgment of
the Supreme Court in favor of the plaintiff, entered in the office
of the clerk of the county of New York on the 10th day of

March, 1919, upon the decision of the court after a trial at the New York Special Term.

The judgment granted an injunction and directed an assessment of damages by a jury at plaintiff's request as a matter of right.

*Siegfried F. Hartman* of counsel [*John B. Stanchfield* with him on the brief], *Stanchfield & Levy,* attorneys, for the appellant Universal Film Manufacturing Company.

*Siegfried F. Hartman,* attorney for the appellant Universal Film Exchange of New York, Inc.

*Edward K. Sumerwell* [*Louis S. Posmer* of counsel], for the respondent.

SMITH, J.:

The action is brought under sections 50 and 51 of the Civil Rights Law, prohibiting the use of a person's name, portrait or picture, without his written consent first obtained, "for advertising purposes or for the purposes of trade." The acts enjoined by the judgment appealed from are, *first,* the presentation of the plaintiff's name and picture as news in a motion picture film depicting current events, and, *second,* the publication of the plaintiff's name and picture on certain posters used to announce the subject of current interest exhibited by the film. The court below found the publication of the plaintiff's name and picture in the motion picture film to be a use for "purposes of trade," but also found that it was not a use "for advertising purposes." On the other hand, the court found that the publication of the plaintiff's name and picture in the posters was a use both for advertising purposes and for purposes of trade. In its decision the court made the following findings:

I. The pictures of the plaintiff complained of were presented in a current number of a weekly film review of current events known as "Universal Animated Weekly" and "Universal Current Events," being a "series of reels of film * * * presenting subjects of news interest."

II. The pictures of events contained in these news reels "are pictures taken on the spot at the time of the occurrence of the event depicted" and "are not reproductions or re-enactments of the events depicted."

III. The news films " contain no advertising matter," " are not used by the defendant   *   *   *   to advertise or exploit other pictures produced by it," their production being " an independent enterprise " " not related in any way to the production of other pictures by the defendant."

IV. The pictures complained of had to do with the plaintiff's solution of a famous murder mystery, a current event of great news interest, which was prominently featured by the public press in the news of the day.

V. The pictures were published by the defendants at the same time that the plaintiff's name and picture were prominently featured in the public press and her work widely commented on and discussed.

VI. The pictures relating to this murder mystery constituted one of ten subjects of current news interest, all presented with equal prominence in the same current number of " Animated Weekly."

VII. The pictures of the plaintiff were actual photographs showing her seated in an automobile with a member of the New York police department, and were taken while the plaintiff was actually engaged in her work on the murder mystery.

VIII. Accompanying the pictures of the plaintiff were photographs of scenes and persons connected with the murder mystery.

IX. The pictures of and the references to the plaintiff truthfully depicted facts connected with the murder mystery.

X. The pictures of the plaintiff as exhibited through this film " were incidental to the presentation of a current event in motion picture form."

The court further held that the plaintiff was entitled under the act to the trial of her damages before a jury as a matter of right.

The defendant Universal Film Manufacturing Company is one of five companies engaged in the business of producing motion picture films of current events and news items. The films produced by this defendant containing such pictures of current events are entitled " Universal Animated Weekly " and " Universal Current Events." Each week the defendant publishes and distributes one number or issue of the " Animated Weekly " and one number or issue of the " Current Events." Each number or issue is comprised in a reel or film approxi-

mately 1,000 feet in length presenting from ten to fifteen subjects, each a matter of current news. For the production of these news reels the defendant maintains a large organization devoted exclusively to the gathering and editing of news items in motion picture form. The photographs which are presented are taken by a corps of motion picture photographers or " reporters " stationed at various parts of the country. Each of these correspondents has a camera and when a news event occurs or is about to occur in the territory assigned to him, he photographs the event and forwards the negative to the main office of the defendant in New York. There are thus submitted each week to the defendant, for inclusion in the two weekly reels of news films, many times more than the 2,000 feet of negative required, so that it is necessary to cull out of the great quantity of pictures submitted 2,000 feet of the most important material. From the negatives thus submitted the selection is made by men of newspaper experience who also compose the captions or explanatory reading matter which preface the presentation of the successive subjects portrayed.

This defendant's news service is shown in motion picture theatres, schools, churches, cantonments, vessels of the Navy; in fact, wherever there are motion picture machines. The news reels are utilized by the government of the United States and by municipal governments for purposes of public good. They have been used for the promoting of the liberty loans, and by the Food Administrator, and by the Fuel Administrator, by the Secretary of War and the Secretary of the Navy for recruiting for the Army and Navy, and by the board of health of the city of New York to prevent the spread of Spanish influenza. These are all found as facts by the court below.

The Universal Film Exchange is another corporation through which the picture films made by the Universal Film Manufacturing Company are distributed to the trade.

There is a clear distinction between a news reel and a motion picture photoplay. A photoplay is inherently a work of fiction. A news real contains no fiction but shows only actual photographs of current events of public interest. The news reel is taken on the spot, at the very moment of the

occurrence depicted, and is an actual photograph of the event itself. The photoplay, as the result of fiction, retains its interest, irrespective of the length of time which has elapsed since its first production, whereas, a news reel, to be of any value in large cities must be published almost simultaneously with the occurrence of the events which it portrays. This news service, as far as it goes, is a truthful, accurate purveyor of news, quite as strictly so as a newspaper. While a newspaper account conveys the news almost entirely by words, the news service conveys the same by photographs with incidental verbal explanation.

This action is brought by this plaintiff, who is a lawyer in the city of New York, to enjoin the publication of a film and for damages claimed to have been suffered by its publication. This film represented her as she was engaged in legal work connected with the solution of the mystery of the disappearance of Ruth Cruger. The body of this girl was, through the efforts of this plaintiff, discovered buried under the floor in the back room of the shop of an Italian in the city of New York. The police had been searching diligently to unravel the mystery of the absence of Ruth Cruger, and it was not until this plaintiff took charge of the matter and insisted upon excavating under the shop of this Italian that the body was discovered. The daily papers, all of them, displayed prominently the fact of this discovery, and the name and picture of the plaintiff as the one through whose persistence and intelligence the discovery had been made. Facts in connection with this discovery were pictured by the reporters of the defendant manufacturing company, and among other things was the picture of the plaintiff in an automobile with a captain of police, while she was actually engaged in the matter. This picture was a truthful picture taken of a current event at the time that it happened. The trial court has held that it was unlawfully published without the written consent of the plaintiff, under sections 50 and 51 of the Civil Rights Law, and this presents the first question for our consideration.

Section 50 provides as follows: " A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person

without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor." Section 51 (as amd. by Laws of 1911, chap. 226) gives to a person whose name, portrait or picture is used within the State for advertising purposes or for the purposes of trade, without the written consent first obtained, an equitable action to prevent and restrain the use thereof and he " may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages." Now, this law was passed in 1903. (Laws of 1903, chap. 132.) It was passed after a decision by the Court of Appeals in 1902, in the case of *Roberson* v. *Rochester Folding Box Company* (171 N. Y. 538) which held that there was no right of privacy, and further held: " An injunction cannot be granted to restrain the unauthorized publication and distribution of lithographic prints, or copies, of a photograph of a young woman as part of an advertisement of a legitimate manufactured article, where there is no allegation that the picture is libelous in any respect, but, on the contrary, the gravamen of the complaint is that the likeness is so good that it is easily recognized and that it has been and is used to attract attention to the advertisement upon which it is placed, although the publication has caused her great mental and physical distress, necessitating the employment and attendance of a physician." In view of the passage of this act at the next session of the Legislature after this decision was handed down by the Court of Appeals, it thus appears what was the primary object of the Legislature in passing this act. At that time the moving picture industry had not been developed. There was no such thing as the publication of current news items by moving picture films, so that it is clear that the Legislature did not have this class of publication in mind at the time of the passage of the law.

It cannot be contended that the publication of moving pictures is not a trade. But we think it is not such trade as was within the contemplation of the Legislature in the passage of the act. They are published for profit, as a newspaper is

published for profit.    Their profit depends upon their ability to present accurate and interesting news, as well as the photoplays of fiction.    It is precisely the same with a newspaper. That the publication of moving pictures is a publication made in trade is held in the case of *Binns* v. *Vitagraph Company* (210 N. Y. 51).    It does not necessarily follow, however, that the statute was meant to apply to all publications, even for the purposes of trade.    To determine whether the publication complained of was within the statute, the whole statute must be considered, both in its origin and in its effect. The presumable motive for its enactment has been indicated as shown in the *Roberson* case cited.    The effect of the statute, interpreted as it has been interpreted by the trial court, is very far reaching and even startling.    Not only is the publication of a portrait or picture without the written consent of the party made a misdemeanor, but the publication of the name of a party without written permission is made a misdemeanor.    The exhibition of a motion picture of a public parade would, under the trial court's interpretation, subject the defendant to prosecution for crime.    The exhibition of a motion picture showing a game of baseball or a game of football would, under the trial court's interpretation of the statute, be a crime, unless with the written consent of every person either among the players or among the spectators shown upon the film whose likeness was distinguishable.    The question is not whether any one, whose picture or name is represented, may feel aggrieved, but the commission of a misdemeanor is a matter of public concern, and the party guilty may be prosecuted upon the complaint of any person, whether aggrieved or not.    Waiving for the moment the question of constitutional right, every newspaper every day would be guilty of a crime, if the construction of the court below be right, in the description of any event wherein persons are named without their written consent.    In the *Binns* case Judge CHASE says that this act clearly would not apply in the case of a single publication in a single newspaper.    Why not, if it applies to the case here presented?    These motion picture films are distributed and shown to different audiences in different parts of the country, just as a newspaper is circulated in different parts of the country and reaches different

readers. For this purpose a number of films are made just as a number of editions of a paper are printed and sent to different communities. When the matter is fresh the event is a matter of interest, but the public soon tires of it and wants fresh news. I am unable to see any practical difference between the presentation of these current events in a motion picture film and in a newspaper, and when it is considered that under plaintiff's interpretation of the statute the mention in any newspaper or motion picture film or any publication of any kind of a single name in connection with any private or public matter, without the written consent of the person named, is a misdemeanor. The court should be slow to so interpret the act. If this statute had simply provided for the right of injunction to prevent the portrayal of the picture of any person without his written consent, a different question might be presented. Under such a statute the court in the case at bar might hold the statute applicable. But where the statute goes further and includes either the name or the picture of a person and makes the publication of either without a written consent a misdemeanor, the reasonable and necessary inference is not only that the statute does not apply to the publication of a newspaper in a single issue, but also the statute does not apply to the publication of a picture or name in a single set of films of actual events issued at one time for distribution in different parts of the country before different audiences as a matter of current news. It matters not what may be the motive in the publishing of these films, whether instructive or whether to satisfy the morbid curiosity, any more than it matters what may be the motive in the publishing of actual news items in a newspaper. The rule of law as held by the Trial Term would make practically impossible the exhibition of films representing current events wherein the name or picture of a living person is given, whether of interesting, instructive or elevating events, or whether introduced for the purpose of courting publicity.

In the same issue of the " Animated Weekly " was published a picture of President Hibben conferring a degree upon a distinguished foreigner. Under the rule of law announced by the Special Term if such publication was without his written consent, the defendant is guilty of a misdemeanor, not only

in the publication of this picture, but in the mention of the name of President Hibben, in the descriptive words which appear as the picture is presented. The defendant would be also guilty of a misdemeanor by exhibiting the picture of the diplomat upon whom the degree was bestowed, and also guilty of a misdemeanor in showing the portrait of some outsider who happened to be within the bounds of the picture. With this interpretation of the statute I cannot agree.

The authorities, so far as they discuss the question, seem to me to be in entire harmony with the conclusion which I have reached. In *Jeffries* v. *N. Y. Evening Journal Pub. Co.* (67 Misc. Rep. 570) Mr. Justice WHITNEY writes that the picture of a person is not used for trade purposes within the meaning of the section when used merely for the dissemination of information and not for commerce or traffic. This decision has been approved in *Colyer* v. *Fox Publishing Co.* (162 App. Div. 297) in the Second Department, where it was held that an actress whose portrait was published in a weekly periodical without her consent, but not for advertising purposes, could not recover damages under the act. In that case a professional diver had had her picture taken in costume which was produced in the *Police Gazette* without her consent, together with other vaudeville actresses in costume, under a heading "Five of a Kind on this Page. Most of Them Adorn the Burlesque Stage, All of Them are Favorites with the Bald Headed Boys." It would seem that if under any such circumstances the statute could be held to apply it would have been held to have applied in that case, but it was there held that the publication was not within the act, as for advertising or for trade purposes.

In the *Binns Case* (210 N. Y. 51) the presentation was not of pictures actually taken at the time of the occurrence of the events, but the film was taken in a studio with actors dressed for the occasion in order to present a representation of what might have occurred. It was held to be pure fiction and not fact, and as such it was held to be within the act and the exhibition of that film was enjoined. In that case Judge CHASE said in his opinion: "It would not be within the evil sought to be remedied by that act to construe it so as to prohibit the use of the name, portrait or picture of a living

person in truthfully recounting or portraying an actual current event as is commonly done in a single issue of a regular newspaper." The representation of this plaintiff was published in a single set of films to be distributed at the same time to different parts of the country as a news item. It was interesting when first exhibited. The fact that these films were widely distributed, so as to be seen by many people, cannot make the offense any greater than would be the offense in a newspaper with a large circulation publishing the same picture or the same names in a single issue. The fact that the picture may have been seen by the same person more than once would not condemn the publication, because a single issue of a newspaper is often seen several times by the same person. The exhibitor of these films with the interest of the public in view is not going to exhibit any news item after the interest in the item has died out. The fact that this publication is so markedly different from the publication which is recognized as the inspiration of the passage of the law in question, in itself furnishes a strong probability that it is not within the prohibitive act, and when the right to an injunction and to damages is based upon an act made criminal by the same statute, the law of strict construction should lead us to interpret the act in favor of the party charged with crime.

A further question arises as to the use of the name and the picture of the plaintiff upon posters used to advertise this exhibition. If it be held that they cannot be used under the statute for the purposes of advertising these motion pictures, then it is clear that they cannot advertise the motion pictures at all, because they cannot be fully advertised, at least, without giving the name of the parties represented. When King Albert landed in New York, one of these companies procured moving pictures of the landing. Those were exhibited the same night in the city of New York, and upon the billboard at the entrance of the theatre it was announced that pictures of the landing of King Albert were to appear that night. Were they guilty of a misdemeanor for this announcement? If the conclusion which I have reached upon the other branch of the case be correct, the presentation of the film describing that landing would not be against the spirit of the act. If so it is difficult to distinguish and say that the advertising of the

film with the simple use of King Albert's name constituted a crime. If the use of his name alone in advertising the film did not constitute a crime, the use of his picture would be no more criminal. So, in the case at bar, if the presentation of this film be not a crime, the use of the plaintiff's name or picture in the approach to the theatre and upon the billboards in front as advertising what was to appear upon the screen is I think incidental to the exhibition of the film itself. The statute we think only prohibits advertising with respect to a trade falling within the scope of the statute. The act should not reasonably be construed to prohibit such use of a name or picture.

The appellants also challenge the holding of the trial court that the plaintiff is entitled to have the jury assess her damages as matter of right. If I am right in my conclusion that neither the production of the film, nor the publication of the name or posters as incidental to the production of that film is within the prohibition of the statute, consideration of this question becomes unnecessary.

The judgment appealed from should be reversed, with costs, and the complaint dismissed, with costs.

LAUGHLIN and MERRELL, JJ., concurred; CLARKE, P. J., and DOWLING, J., dissented as to the poster advertisements.

Judgment reversed, with costs, and complaint dismissed, with costs. Order to be settled on notice.