797 F.2d 1270
 55 USLW 2098, 21 Fed. R. Evid. Serv. 401,
13 Media L. Rep. 1145
 Reverend Jerry FALWELL, Appellee,
v.
Larry C. FLYNT; Hustler Magazine, Inc., Appellants,
and
Flynt Distributing Company, Inc., Defendant.
Reverend Jerry FALWELL, Appellant,
v.
Larry C. FLYNT, Hustler Magazine, Inc.; Flynt Distributing
Company, Inc., Appellees.
 Nos. 85-1417(L), 85-1480.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 8, 1986.
Decided Aug. 5, 1986.
Rehearing and Rehearing En Banc Denied Nov. 4, 1986.
*
 
 Alan L. Isaacman and David Carson (Cooper, Epstein & Hurewitz, Beverly Hills, Cal., Arthur P. Strickland, Strickland & Rogers, Roanoke, Va., on brief) for appellants/cross-appellees.
 Norman Roy Grutman (Jewel H. Bjork, Jeffrey H. Daichman, Thomas V. Marino, Grutman, Miller, Greenspoon, Hendler & Levin, New York City, on brief), for appellee/cross-appellant.
 Before HALL and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 CHAPMAN, Circuit Judge:
 
 
 1
 This lawsuit arises out of an "ad parody" that appeared in the November 1983 and March 1984 issues of Hustler, which is published by defendants Larry Flynt and Hustler Magazine, Inc. (Hustler), and is distributed by defendant Flynt Distributing Company (FDC). The subject of this parody was the Reverend Jerry Falwell, a well-known pastor and commentator on political issues. Falwell sued the defendants for libel, invasion of privacy, and intentional infliction of emotional distress. At the close of evidence, the district court dismissed Falwell's claim for invasion of privacy and sent the other two claims to the jury. The jury found against Flynt and Hustler on the emotional distress claim and against Falwell on the libel claim.
 
 
 2
 These defendants have appealed, and Falwell has filed a cross appeal. The issues before this court can be grouped into four categories: the constitutional issues, the common law tort issues related to intentional infliction of emotional distress, the evidentiary issues, and finally, Falwell's cross appeal, which claims that the district court erred in dismissing his claim for invasion of privacy.
 
 
 3
 * The "ad parody" which gives rise to the instant litigation attempts to satirize an advertising campaign for Campari Liqueur. In the real Campari advertisement celebrities talk about their "first time." They mean, their first encounter with Campari Liqueur, but there is double entendre with a sexual connotation. In the Hustler parody, Falwell is the celebrity in the advertisement. It contains his photograph and the text of an interview which is attributed to him. In this interview Falwell allegedly details an incestuous rendezvous with his mother in an outhouse in Lynchburg, Virginia. Falwell's mother is portrayed as a drunken and immoral woman and Falwell appears as a hypocrite and habitual drunkard. At the bottom of the page is a disclaimer which states "ad parody--not to be taken seriously." The parody is listed in the table of contents as "Fiction; Ad and Personality Parody."
 
 
 4
 Falwell was first shown the ad parody by a reporter in the fall of 1983. Shortly thereafter, he filed suit against Flynt, Hustler and FDC in the United States District Court for the Western District of Virginia. Falwell alleged three theories of liability: libel, invasion of privacy under Va. Code Sec. 8.01-40 (1984), and intentional infliction of emotional distress. Hustler then republished the parody in its March 1984 issue.
 
 
 5
 In June 1984, Falwell's counsel took Larry Flynt's deposition, which was recorded on video tape. During the deposition Flynt identified himself as Christopher Columbus Cornwallis I.P.Q. Harvey H. Apache Pugh and testified that the parody was written by rock stars Yoko Ono and Billy Idol. It also contained the following colloquy concerning the parody:
 
 
 6
 Q. Did you want to upset Reverend Falwell?
 
 
 7
 A. Yes....
 
 
 8
 Q. Do you recognize that in having published what you did in this ad, you were attempting to convey to the people who read it that Reverend Falwell was just as you characterized him, a liar?
 
 
 9
 A. He's a glutton.
 
 
 10
 Q. How about a liar?
 
 
 11
 A. Yeah. He's a liar, too.
 
 
 12
 Q. How about a hypocrite?
 
 
 13
 A. Yeah.
 
 
 14
 Q. That's what you wanted to convey?
 
 
 15
 A. Yeah.
 
 
 16
 Q. And didn't it occur to you that if it wasn't true, you were attacking a man in his profession?
 
 
 17
 A. Yes.
 
 
 18
 Q. Did you appreciate, at the time that you wrote "okay" or approved this publication, that for Reverend Falwell to function in his livelihood, and in his commitment and career, he has to have an integrity that people believe in? Did you not appreciate that?
 
 
 19
 A. Yeah.
 
 
 20
 Q. And wasn't one of your objectives to destroy that integrity, or harm it, if you could?
 
 
 21
 A. To assassinate it.
 
 
 22
 [J.A. 901-902].
 
 
 23
 Trial began in December 1984. While the district court had initially granted the defendant's pretrial motion to suppress the deposition on the grounds that Flynt could not comprehend the obligation of the oath or give a correct account of events, the district court reversed itself on the first day of trial and permitted Falwell to introduce an edited version containing only those portions relevant to the instant lawsuit. The defendants then showed the jury the entire deposition, stating that the edited deposition was misleading. In spite of the defendants' strenuous objections, the district court also permitted the introduction of the two Hustler issues containing the parody and excerpts from prior issues that had lampooned Falwell.
 
 
 24
 At the close of evidence, the district court dismissed Falwell's invasion of privacy claim brought under Va.Code 8.01-40 (1984), which creates a cause of action for damages arising from the use of a person's name or likeness for purposes of trade or advertising without his consent. The district court ruled that although the parody used Falwell's name and likeness, the use was not for purposes of trade within the meaning of the statute.
 
 
 25
 The jury returned a verdict for the defendants on the libel claim, finding that no reasonable man would believe that the parody was describing actual facts about Falwell. On the emotional distress claim, the jury returned a verdict against Flynt and Hustler, but not F.D.C. The jury awarded $100,000 in actual damages, $50,000 in punitive damages against Flynt, and $50,000 in punitive damages against Hustler.
 
 II
 
 26
 The defendants make two constitutional arguments. First, they assert that since Falwell is admittedly a public figure the actual malice standard of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) must be met before Falwell can recover for emotional distress. They argue that the actual malice standard has not been met. Second, the defendants contend that since the jury found that the parody was not reasonably believable,[1] the statements contained therein cannot be statements of fact but must be opinion and are, therefore, completely shielded by the first amendment.
 
 
 27
 The defendants maintain initially that since Falwell is a public figure, they are entitled to the same level of first amendment protection in an action for intentional infliction of emotional distress that they would receive in an action for libel. We agree. Once an action for libel was a plaintiff's sole remedy for a defamatory publication in a news medium. The last century has, however, seen the acceptance of the new emotional distress and invasion of privacy torts which may arise from the same underlying facts. Thus, while a tortious publication once gave rise only to an action for libel, it may now support the additional claims. There has been, of late, a growing trend toward pleading libel, invasion of privacy and intentional infliction of emotional distress in lawsuits arising from a tortious publication. Mead, Suing the Media for Emotional Distress: A Multi-Method Analysis of Tort Law Evolution, 23 Wash.L.J. 24 (1983). The instant case typifies this trend; Falwell asserted all three theories of liability.
 
 
 28
 In New York Times, the Supreme Court determined that libel actions brought by public officials against the press can have a chilling effect on the press inconsistent with the first amendment. Therefore, when a public official sues for libel based upon a tortious publication, the defendant is entitled to a degree of first amendment protection. This protection has been extended to cases in which the plaintiff is a public figure, Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) and to actions of invasion of privacy for casting the plaintiff in a false light, Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), but not to cases in which the plaintiff is a private figure. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). It is not the theory of liability advanced, but the status of the plaintiff, as a public figure or official and the gravamen of a tortious publication which give rise to the first amendment protection prescribed by New York Times.
 
 
 29
 In the case at bar, Falwell is a public figure, and the gravamen of the suit is a tortious publication. The defendants are, therefore, entitled to the same level of first amendment protection in the claim for intentional infliction of emotional distress that they received in Falwell's claim for libel. To hold otherwise would frustrate the intent of New York Times and encourage the type of self censorship which it sought to abolish.
 
 
 30
 The issue then becomes what form the first amendment protection should take in an action for intentional infliction of emotional distress. The defendants argue that Falwell must prove that the parody was published with knowing falsity or reckless disregard for the truth. This is the actual malice standard of New York Times v. Sullivan.[2] While we agree that the same level of protection is due the defendants, we do not believe that the literal application of the actual malice standard which they seek is appropriate in an action for intentional infliction of emotional distress.
 
 
 31
 The actual malice standard originated as a remedy for the first amendment problem that arises under common law defamation. Historically, the individual's interest in a good reputation has been regarded as so significant that the law has held one who intentionally published defamatory material to a standard of strict liability. But recognizing that people in a free society must have ready access to information and ideas if that society is to endure, the established common law attempted to reconcile these divergent interests by holding a publisher strictly liable for his publication unless he could prove that the publication was either true or subject to a conditional privilege. There was no privilege for a good faith mistake of fact. Owens v. Scott Publishing, 46 Wash.2d 666, 284 P.2d 296 (1955), cert. denied 350 U.S. 968, 76 S.Ct. 437, 100 L.Ed. 840 (1956); Peck v. Tribune Company, 214 U.S. 185, 29 S.Ct. 554, 53 L.Ed. 960 (1909).
 
 
 32
 The Supreme Court changed the law in New York Times v. Sullivan. The court held that defendants could be held liable for defamation of public officials only if the defamatory falsehood was published with actual malice.[3] The effect of New York Times and its progeny is to increase the level of fault necessary for a public figure to prevail in an action for defamation. Where the defendant was once held strictly liable for a false publication, he is now held liable only for his knowing or reckless misconduct. New York Times gives the press protection from honest mistakes, but it is not a license to lie.
 
 
 33
 The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity.... Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.
 
 
 34
 Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).
 
 
 35
 When applied to a defamation action, the actual malice standard alters none of the elements of the tort; it merely increases the level of fault the plaintiff must prove in order to recover in an action based upon a publication. Requiring a plaintiff to prove knowledge of falsity or reckless disregard of the truth in an action for intentional infliction of emotional distress would add a new element to this tort, and alter its nature.[4] The defendants argue that New York Times dictates such a result. But their argument emphasizes the language "falsity or ... disregard for the truth," and thus misreads New York Times. Properly read, New York Times focuses on culpability. The emphasis of the actual malice standard is "knowing ... or reckless."
 
 
 36
 The first of the four elements of intentional infliction of emotional distress under Virginia law requires that the defendant's misconduct be intentional or reckless. This is precisely the level of fault that New York Times requires in an action for defamation. The first amendment will not shield intentional or reckless misconduct resulting in damage to reputation, and neither will it shield such misconduct which results in severe emotional distress. We, therefore, hold that when the first amendment requires application of the actual malice standard, the standard is met when the jury finds that the defendant's intentional or reckless misconduct has proximately caused the injury complained of. The jury made such a finding here, and thus the constitutional standard is satisfied.
 
 
 37
 The defendants also argue that since the jury found that a reader could not reasonably believe that the parody was describing actual facts about Falwell, it must be an opinion and therefore is protected by the first amendment. At common law the dichotomy between statements of fact and opinion was often dispositive in actions for defamation. An action for intentional infliction of emotional distress concerns itself with intentional or reckless conduct which is outrageous and proximately causes severe emotional distress, not with statements per se. We need not consider whether the statements in question constituted opinion, as the issue is whether their publication was sufficiently outrageous to constitute intentional infliction of emotional distress. The defendants' argument on this point is, therefore, irrelevant in the context of this tort.
 
 III
 
 38
 The defendants argue that since Falwell was unable to recover for libel, he cannot recover for emotional distress. It is the defendant's theory that emotional distress is intended to provide tort remedies to plaintiffs who have none, but that intentional infliction of emotional distress is not available when the conduct complained of falls well within the ambit of other traditional tort liability. While there is some support for the defendant's position in at least one jurisdiction, see Fischer v. Maloney, 43 N.Y.2d 553, 373 N.E.2d 1215, 402 N.Y.S.2d 991 (1978), we believe the law of Virginia to be otherwise. Raftery v. Scott, 756 F.2d 335 (4th Cir.1985). The elements of libel and intentional infliction of emotional distress are different and the facts in the instant case will independently support the latter tort. We are convinced, therefore, that Falwell's failure to recover for libel does not, as a matter of law, prevent him from recovering for intentional infliction of emotional distress. Cf. Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265 (3rd Cir.1979) (en banc ).
 
 
 39
 The defendants also argue that Falwell presented insufficient evidence to sustain any of the elements of intentional infliction of emotional distress. We may reverse a jury verdict only when there is a complete absence of facts to support the conclusions reached by the jury. Sherril White Construction, Inc. v. South Carolina National Bank, 713 F.2d 1047 (4th Cir.1983). The four elements which must be shown in order to recover for intentional infliction of emotional distress in Virginia have been set forth in footnote 4.
 
 
 40
 In his deposition, Flynt testified that he intended to cause Falwell emotional distress. If the jury found his testimony on this point to be credible, then it could have found that Falwell satisfied the first element. Evidence of the second element, outrageousness, is quite obvious from the language in the parody and in the fact that Flynt republished the parody after this lawsuit was filed. The final elements require the plaintiff to prove that the defendant's conduct proximately caused severe emotional distress. At trial, when Falwell was asked about his reaction to the parody, he testified as follows:
 
 
 41
 A. I think I have never been as angry as I was at that moment.... My anger became a more rational and deep hurt. I somehow felt that in all of my life I had never believed that human beings could do something like this. I really felt like weeping. I am not a deeply emotional person; I don't show it. I think I felt like weeping.
 
 
 42
 Q. How long did this sense of anger last?
 
 
 43
 A. To this present moment.
 
 
 44
 Q. You say that it almost brought you to tears. In your whole life, Mr. Falwell, had you ever had a personal experience of such intensity that could compare with the feeling that you had when you saw this ad?
 
 
 45
 A. Never had. Since I have been a Christian I don't think I have ever intentionally hurt anybody. I am sure I have hurt people but not with intent. I certainly have never physically attacked anyone in my life. I really think that at that moment if Larry Flynt had been nearby I might have physically reacted.
 
 
 46
 A colleague of Falwell's, Dr. Ron Godwin, testified that Falwell's enthusiasm and optimism visibly suffered as a result of the parody. Godwin also stated that Falwell's ability to concentrate on the myriad details of running his extensive ministry was diminished. This testimony would enable a jury to find that Falwell's distress was severe and that it was proximately caused by defendant's publication of the parody. We find, therefore, that the evidence is sufficient to sustain the jury's verdict against the defendants for intentional infliction of emotional distress.
 
 IV
 
 47
 The defendants appeal several evidentiary rulings made by the district court during the course of trial. The primary issue involves the district court's decision to admit Flynt's videotaped deposition. The defendants argue that Flynt was mentally incapable[5] of telling the truth at the time he was deposed. At common law a charge of mental incapacity could be used to challenge a witness' competency to testify, but under the Federal Rules of Evidence this objection excludes testimony only in the rare case in which the judge finds that because of the witness' infirmities, the proffered testimony fails to meet the relevancy requirements of Rules 104(b), 401 and 403. Consequently, in cases in which lawyers would have once argued to the judge that a witness should not be heard, they now argue to the jury that the witness should not be believed. J. Weinstein & M. Berger, 3 Weinstein's Evidence, Sec. 607 (1985). The Notes of Advisory Committee on Proposed Rules for Rule 601 offer the following instruction:
 
 
 48
 No mental or moral qualifications for testifying as a witness are specified. Standards of mental capacity have proved elusive in actual application. A leading commentator observes that few witnesses are disqualified on that ground. Discretion is regularly exercised in favor of allowing the testimony. A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence. (Citations omitted)
 
 
 49
 We agree with these authorities. The relevant question posed by Flynt's deposition testimony was not one of competency but rather of credibility. The district court did not abuse its discretion in admitting that evidence.
 
 
 50
 The defendants argue that the district court erred in admitting derogatory statements about Falwell that had been published in prior issues of Hustler. The defendants admit that these statements might be indicative of hatred or ill will toward Falwell, but they argue such evidence is not relevant to the actual malice inquiry necessitated by Falwell's libel claim. It is, however, well established that the jury may infer from the totality of the defendant's conduct toward a plaintiff "a predetermined and preconceived plan to malign [plaintiff's] character" and cause him injury which is, of course, a functional definition of actual malice. Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir.1969), cert. denied 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). This evidence was properly admitted.
 
 
 51
 The defendants also objected to the introduction of those issues of Hustler in which the parody had appeared. They maintained that the magazines were irrelevant in the first place and more prejudicial than probative in the second place. The context in which the parody was published is relevant to Falwell's libel claim on the issue of the credibility of the statements made about Falwell and on the issue of damages. The defendants' objection that these magazines were more prejudicial than probative must also fail, since it was necessary for the jury to see the parody in context in order to decide these issues. See Douglass v. Hustler Magazine, Inc., 769 F.2d 1128 (7th Cir.1985).
 
 V
 
 52
 At the close of evidence, the district court dismissed Falwell's action for invasion of privacy pursuant to Va.Code Sec. 8.01-40 (1985) on the grounds that the ad parody which appeared in Hustler did not constitute a use of Falwell's name and likeness "for purposes of trade" within the meaning of the statute. Falwell has filed a cross appeal alleging that the district court erred in this ruling. We disagree.
 
 
 53
 The Virginia statute reads, in pertinent part:
 
 
 54
 Any person whose name, portrait, or picture is used without having first obtained the written consent of such person ... for advertising purposes or for the purposes of trade, such persons may maintain a suit in equity against the person, firm, or corporation so using such person's name, portrait, or picture to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use. And if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by this chapter, the jury, in its discretion, may award exemplary damages.
 
 
 55
 There are no decisions of the Virginia courts which construe this statute. This statute is, however, substantially similar to Sec. 51 of the New York Civil Rights Law. This court has looked to the New York courts for guidance in construing the Virginia privacy statute. Brown v. American Broadcasting Co., 704 F.2d 1296 (4th Cir.1983).
 
 
 56
 In order to further the legitimate dissemination of news and information, the New York courts have routinely held that use of a public figure's name or likeness cannot constitute a use for purposes of trade. See Humiston v. Universal Film Mfg. Co., 189 App.Div. 467, 178 N.Y.S. 752 (1st Dep't 1919) and Gautier v. Pro-Football, Inc., 304 N.Y. 354, 107 N.E.2d 485 (1952). There is an exception to this general rule which holds that if the use of a public figure's name or likeness is infected with substantial and material falsification, and if it is published with knowledge of such falsification or with reckless disregard for the truth, then it is a use for purposes of trade and the public figure can recover. Spahn v. Julian Messner, Inc., 21 N.Y.2d 124, 233 N.E.2d 840, 286 N.Y.S.2d 832 (1967), appeal dismissed 393 U.S. 1046, 89 S.Ct. 676, 21 L.Ed.2d 600 (1969). This exception has been further refined in the case of Hicks v. Casablanca Records, 464 F.Supp. 426 (S.D.N.Y.1978) in which the court held that in addition to containing substantial and material falsification, the use of the public figure's name or likeness must take such a form that the reader would reasonably believe the falsification. Thus, in Spahn where the use took the form of biography, there was a use for purposes of trade, but in Hicks where the use took the form of a novel, there was no use for purposes of trade.
 
 
 57
 Because the jury found that the parody in the instant case was not reasonably believable and because it contained a disclaimer, publication of the parody did not constitute a use of Falwell's name and likeness for purposes of trade. The district court properly dismissed this claim. For these reasons, the decision of the district court is affirmed.
 
 
 58
 AFFIRMED.
 
 
 
 *
 The order denying rehearing, with dissenting opinions, will be published in 805 F.2d ---
 
 
 [1]
 Defendants argue that the more vile and outrageous the statement about a public figure, the greater the protection to the publisher because the public is not apt to believe such a statement
 
 
 [2]
 "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'--that is, with knowledge that it was false or with reckless disregard of whether it was false or not."
 376 U.S. at 279-80, 84 S.Ct. at 726.
 
 
 [3]
 Actual malice under New York Times is different from common law malice, which is the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent. New York Times' actual malice might be better understood if designated as "constitutional malice" or "publication malice."
 
 
 [4]
 In Virginia, the essential elements to be proved in an action for intentional infliction of emotional distress are that the wrongdoer's conduct (1) is intentional or reckless; (2) offends generally accepted standards of decency or morality; (3) is causally connected with plaintiff's emotional distress; and (4) caused emotional distress that was severe. Womack v. Eldridge, 215 Va. 338, 210 S.E.2d 145, 148 (1974)
 
 
 [5]
 He had recently suffered a broken leg and was on medication