**RAMON S. VELEZ, Appellant-Respondent, v VV PUBLISHING CORP. et al., Respondents-Appellants.**

First Department, January 28, 1988

## APPEARANCES OF COUNSEL

*Paul E. Fleifer (Craig Bleifer* with him on the brief), for appellant-respondent.

*Victor A. Kovner* of counsel *(Lisa R. Lipman* with him on the brief; *Lankenau Kovner & Bickford,* attorneys), for respondents-appellants.

## OPINION OF THE COURT

SULLIVAN, J.

This appeal presents the question of whether a subscription-soliciting advertisement containing a reproduction of the cover of one of the earlier editions of the weekly newspaper being advertised violated sections 50 and 51 of the Civil Rights Law because of the addition of a cartoon balloon indicating that the person whose picture appeared on the cover of the advertised edition was asking, "What's your address?*'" The asterisk following the question led the reader to a subscription coupon.

In its December 31, 1985 issue the Village Voice published a lengthy investigative report, "How Ramon Velez Bleeds New York", highly critical of Velez, a well-known activist in the Hispanic community. The title of the report and a picture of a smiling Velez were featured on the cover. During that same period the Voice regularly included reproductions of the covers of recent editions in its advertisements for new subscriptions. The reproductions were embellished by the addition of a cartoon balloon generally directed at the face of the personality who appeared on that particular cover. The cartoon balloons usually contained phrases such as, "We'll be right over" or "What's your address?", with an asterisk referring the reader to the subscription coupon within the advertisement. None of the persons whose names or pictures appeared on the covers of the prior issues ever gave a consent to the Voice for the use of their name or picture either on the cover or in the subscription advertisements. In its January 7, 1986 edition, the Voice published a subscription advertisement containing the December 31, 1985 cover and a cartoon balloon directed at the face of Velez with the words "What's your address?" followed by an asterisk directing the reader to the subscription coupon.[1]

---

1. Both the December 31, 1985 Village Voice cover and the January 7, 1986 advertisement appear as an Appendix to this opinion.

Velez thereafter commenced this action seeking both compensatory and punitive damages, and simultaneously moved for an order enjoining any further publication of the advertisement and awarding him summary judgment on his claims of a violation of his statutory right to privacy. The Voice cross-moved to dismiss on the ground that the advertisement, on its face, was protected by the incidental use exemption of the Civil Rights Law. Notwithstanding that issue had not been joined, the court considered plaintiff's motion for judgment and the Voice's motion as motions for summary judgment, denied both, and granted plaintiff's motion for injunctive relief to the extent of preliminarily enjoining any republication of the advertisement. Both parties appealed. We find that the complaint should have been dismissed, and modify accordingly.

Recognizing that the periodical publisher's incidental use of covers or other portions of past editions of its own publications in promotional materials or advertisements is a necessary and logical extension of the clearly protected editorial use of the content of the publication, New York courts have established an exemption to section 51 of the Civil Rights Law.[2] (See, e.g., Humiston v Universal Film Mfg. Co., 189 App Div 467; Booth v Curtis Publ. Co., 15 AD2d 343, affd 11 NY2d 907; Namath v Sports Illustrated, 48 AD2d 487, affd 39 NY2d 897.)

In Booth (supra), the publisher of Holiday, as part of a full-page advertisement of the magazine, republished in other periodicals a dramatic photograph of Shirley Booth, the well-known actress, that had originally appeared as an illustration to an article in its February 1959 issue. Booth had neither objected to being photographed nor signed a consent for the initial publication, and never consented to the republication in the advertisement. Noting that "[i]t stands to reason that a publication can best prove its worth and illustrate its content by submission of complete copies of or extraction from past

2. Civil Rights Law § 51, in relevant part, provides: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by section fifty of this article, the jury, in its discretion, may award exemplary damages."

editions" *(supra,* at 349), this court dismissed Booth's claim on the ground that the republication of the photograph in the advertisement fell within the incidental use exemption established in *Humiston v Universal Film Mfg. Co.* (189 App Div 467, *supra).* In *Humiston,* this court held that a news disseminator was entitled to display extracts of its product for purposes of attracting users and selling its product. The plaintiff's name and picture had been presented as news in a motion picture film depicting a current event, the solution of a famous murder mystery, and then reproduced on certain posters used to advertise the film exhibition. Thus, the incidental use in an advertisement by a news disseminator of a person's name or identity does not violate the statutory proscription, if it had previously published the item exhibited as a matter of public interest. In such circumstances, the publisher is entitled to demonstrate the over-all quality and content of its work by exhibiting reproductions of all or part of the original publication. *(Booth v Curtis Publ. Co., supra,* 15 AD2d, at 349.)

Even before *Booth (supra),* the law had been well settled in this State that publication of a picture illustrative of a matter of public interest does not constitute a commercial use of the type proscribed by the statute. In *Dallesandro v Holt & Co.* (4 AD2d 470), the use of a picture of the plaintiff, a longshoreman and union member, on the cover of a book, "Waterfront Priest", was found to be protected because "[a] picture illustrating an article on a matter of public interest is not considered used for the purpose of trade or advertising within the prohibition of the statute * * * unless it has no real relationship to the article * * * or unless the article is an advertisement in disguise" *(supra,* at 471).

In *Oma v Hillman Periodicals* (281 App Div 240), the picture of a well-known boxer appearing on a magazine cover with the caption, "Tycoon—this man can make $25,000 on a single deal, but it might cost him his life. Why? See page 24," was found to be illustrative of an article on a matter of public concern and therefore not actionable as a Civil Rights Law violation. In *Koussevitzky v Allen, Towne & Heath* (188 Misc 479, *affd* 272 App Div 759), advertisements or announcements of a biography which did not fall within the proscription of the Civil Rights Law were similarly found to be protected since they are incidental to the publication.

In *Murray v New York Mag. Co.* (27 NY2d 406), a post-*Booth* case, the plaintiff, a spectator at New York City's St. Patrick's

Day Parade, attired in what some may regard as typical garb for the day—a so-called "Irish" hat, green bow tie and green pin—was photographed, without his consent, by a photographer who later sold the picture to the defendant. Two years later the photograph appeared on the front cover of a March 17th issue of the defendant's magazine directly under the title of a feature article in bold green print—"The Last of the Irish Immigrants". The article did not name the plaintiff, nor did it make any reference to the cover photograph. In holding that the publication of the photograph was not actionable, the court found that the article was concerned with an event of public interest and that the photograph was used to highlight a newsworthy event. The court further observed that the photograph was not unrelated to the article's subject matter and that "the plaintiff was singled out and photographed because his presence constituted a visual participation in a public event which invited special attention" *(supra,* at 409).

In another post-*Booth* case, *Arrington v New York Times Co.* (55 NY2d 433), a newspaper magazine's nonconsensual publication of the plaintiff's photograph as a prominent illustration of a feature article on " 'the role of the expanding black middle/professional class in today's society' " *(supra,* at 437) was held not a use for the purposes of trade or advertising within the statutory prohibition, notwithstanding the plaintiff's disagreement with the text of the article, since it related to a subject of public interest.

Nor is the concern of New York courts for the unfettered dissemination of news and views affected by the commercial nature of the publication or the profit motive involved. This is consistent with Federal constitutional doctrine. "That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." *(Joseph Burstyn, Inc. v Wilson,* 343 US 495, 501-502; *see also, New York Times Co. v Sullivan,* 376 US 254, 266; *Smith v California,* 361 US 147, 150.) Even if the "manner of use and placement [of a photograph] was designed to sell [an] article so that it might be paid for and read" *(Oma v Hillman Periodicals, supra,* 281 App Div, at 244), as long as the article involves a matter of public interest, the publication is protected. *(Arrington v New York Times Co., supra,* 55 NY2d, at 440.)

In *Namath v Sports Illustrated* (48 AD2d 487, *supra),* previously used photographs of the plaintiff performing at the 1969

Super Bowl game were republished in a series of advertisements promoting the sale of subscriptions to Sports Illustrated. The photographs were cropped versions of the originals, lifted from the context in which they originally appeared. In those advertisements where it did appear, a small reproduction of the Sports Illustrated cover was placed beneath one of the photographs. The advertisement included such sales pitches as "How to get close to Joe Namath", "The Man You Love Loves Joe Namath" and "Give Sports Illustrated for Christmas". Yet, these advertisements were also found to be fully protected by the incidental use exemption.

Of course, as both *Booth (supra,* 15 AD2d, at 350) and *Namath* (48 AD2d 488, *supra)* expressly recognized, the exemption is not available where the republication is used in an advertising context which conveys or reasonably suggests the subject's endorsement of the publication in question. In the instant case, however, the context in which the cartoon balloon appeared signaled fiction or satire. Extending from the photograph of plaintiff on a cover headlined: "How Ramon Velez Bleeds New York"—the cartoon could not reasonably have been taken literally. It was satiric at worst. To the reasonable reader, the cartoon balloon and its content would have been construed as pure fantasy. *(See, Pring v Penthouse Intl.,* 695 F2d 438, 442, *cert denied* 462 US 1132.) No reasonable reader would believe that plaintiff had actually endorsed the Village Voice.[3] Nor is it material from the perspective of a Civil Rights Law violation that a reader might have inferred that plaintiff was being compensated for permitting his photograph to be so used. *(Booth v Curtis Publ. Co., supra,* 15 AD2d, at 350.)

In other contexts, courts have dismissed claims based on cartoons and cartoon balloons because they have found that generally cartoons cannot reasonably be interpreted as "literally depicting an actual event or situation", that a "strictly literal interpretation ignores the nature of a cartoon and how cartoons are traditionally understood by those who view them * * * [and] 'is tortured and extreme' ". *(Keller v Miami Herald Publ. Co.,* 778 F2d 711, 716, *reh denied* 783 F2d 205, quoting *Valentine v C.B.S., Inc.,* 698 F2d 430, 432.)

In *Keller (supra),* the court held nonactionable a cartoon

---

**3.** Similarly, no reasonable person would believe that Mayor Koch, A.M. Rosenthal or the others whose cover illustrations, the record shows, contained comparable balloons had uttered or approved similar queries.

depicting three men dressed as gangsters, each holding a sack of money in a dilapidated nursing home that had been closed by State order. Although the court noted that the controversy surrounding the closing of the nursing home depicted in the cartoon was well known (so that the context in which readers viewed the cartoon would indicate the lack of literal meaning), it essentially relied upon the nature of the message itself: "the medium in which the statement was expressed clearly signaled to its readers that the statement was merely an opinion. Cartoons are seldom vehicles by which facts are reported; quite the contrary, they are deliberate departures from reality designed forcefully * * * to express opinion." *(Supra,* at 718; *see also, Loeb v Globe Newspaper Co.,* 489 F Supp 481 [cartoon portraying a well-known publisher, with a cuckoo bird springing from his forehead captioned "The Thoughts of Chairman Loeb", held protected because not to be taken literally]; *Yorty v Chandler,* 13 Cal App 3d 467, 91 Cal Rptr 709 [cartoon portraying former Los Angeles Mayor on the telephone "confirming" his appointment as Secretary of Defense while doctors with a straightjacket cautiously approached him not to be read literally].)[4]

Notable, too, is the inclusion in the advertisement of the entire Voice cover, which contains, in addition to the headline "How Ramon Velez Bleeds New York" and the photograph of Velez, five other headlines and the masthead. It is in this complete context that the cartoon balloon with the words "What's your address?" is displayed. In contrast, in *Namath (supra),* one protected advertisement employed a photograph in a manner totally unrelated to its original use and weaved

---

4. Even apparently factual statements have been afforded protection where the court found that a reasonable reader would recognize them as satire, allegory, rhetorical hyperbole or fantasy. *(See, e.g., Mr. Chow of N. Y. v Ste. Jour Azur,* 759 F2d 219 [apparently factual descriptions of food, e.g., "green peppers * * * remained still frozen on the plate", in a restaurant review was absolutely protected as rhetorical hyperbole]; *Silberman v Georges,* 91 AD2d 520 [claim based upon an allegorical painting entitled "The Mugging of the Muse" which contained resemblances of plaintiffs as muggers dismissed on ground that no reasonable person could view the painting as a statement that either plaintiff had participated in an assault]; *Pring v Penthouse Intl.,* 695 F2d 438, 443, *cert denied* 462 US 1132 [reference in a fiction story to a baton twirling Miss Wyoming who levitated her coach by performing fellatio on stage at the Miss America Pageant was nothing more than an absolutely protected satire because "it is simply impossible to believe that a reader would not have understood that the charged portions [of the story] were pure fantasy and nothing else"].)

Namath's frame into the Sports Illustrated Christmas coupon design.

Even the advertisement in *Booth (supra)* comes far closer to suggesting an endorsement. Booth had not appeared on the Holiday cover, yet a three-quarter page photograph of her appeared in the advertisement. Moreover, the caption, "Holiday wades right in at Jamaica's Round Hill colony", comes far closer to suggesting that Booth was acting for Holiday, than does the satiric cartoon balloon at issue here, which, in contrast, is juxtaposed to the entire Voice cover. The satiric nature of the cartoon balloon, apparent even when used in connection with a neutral or affirmative story, becomes compellingly clear when used with a cover story entitled, "How Ramon Velez Bleeds New York." As the Court of Appeals has noted: " 'In determining the meaning of a communication, words, whether written or spoken, are to be construed together with their context. Words which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable.' " *(Balabanoff v Hearst Consol. Publs.,* 294 NY 351, 355; quoting the Restatement of Torts § 563 [d]; *see also, James v Gannett Co.,* 40 NY2d 415; *Mencher v Chesley,* 297 NY 94.)* Since the advertisement at issue is, as a matter of law, an obviously satiric or hyperbolic expression, it cannot constitute an implied endorsement.

Accordingly, the order of the Supreme Court, Bronx County (Jack Turret, J.), entered September 2, 1986, which, *inter alia,* denied defendant's cross motion for summary judgment dismissing the complaint should be modified, on the law, to grant said cross motion and dismiss the complaint and, except as thus modified, affirmed, without costs or disbursements.

KUPFERMAN, J. P., SANDLER and MILONAS, JJ., concur.

Order, Supreme Court, Bronx County, entered on or about September 2, 1986, unanimously modified, on the law, to grant defendants' cross motion and dismiss the complaint and, except as thus modified, affirmed, without costs and without disbursements.

IF I WERE COMMISH . . . (1985 FINAL SCORE, P. 1)

# the village VOICE

••••••••••••••5-DIGIT 10239
VV JCKSOC JGLP831 07
LANEE910 COLEX 87 CE7OR 517
32 ROCKEFELLER 652 DIR
NEW YORK NY 10239

*Number One
with a Bullet*

Pete Hamill on the Mob
and Big Paul (P. 10)

VOL. XXX NO. 53 THE WEEKLY NEWSPAPER OF NEW YORK DECEMBER 31, 1985 $1.00

# How Ramon Velez Bleeds New York

An Investigative Report
by Wayne Barrett (P. 15)

EMO PHILIPS

SADE OPERATES

*Thomas's Tragic Son
(Anthony Heilbut, P. 45)*

Jan 7, 1986