James BEATTIE

v.

FLEET NATIONAL BANK et al.

No. 98–338–Appeal.

Supreme Court of Rhode Island.

March 3, 2000.

---

718

Joseph A. Kelly, Providence, for plaintiff.

David E. Maglio, III, Providence, Thomas M. Elcock, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## O P I N I O N

FLANDERS, Justice.

This is a defamation action concerning a mortgage lender's derogatory opinion about an allegedly inflated real estate appraisal. The Superior Court dismissed the complaint of the plaintiff, James Beattie (Beattie), an independent real estate appraiser, after it granted summary judgment to the defendants Fleet National Bank, Fleet Mortgage Group, Inc. (Fleet Mortgage or the bank), and Max T. Cornwell (Cornwell). Beattie appeals from the final judgment in favor of the defendants.

### Summary of the Case

Beattie's lawsuit arose out of a February 1996 letter that Fleet Mortgage sent to him. The letter concerned a real estate appraisal Beattie had submitted to the bank. In the letter, the bank communicated not only its derogatory opinion of the appraisal but also its reasons for holding this opinion. Fleet Mortgage had hired Beattie to value a certain residential property that was the subject of a pending mortgage-loan-refinancing application with the bank. Beattie appraised the property, and then forwarded a written report to the bank. After reviewing the report and an in-house appraiser's critique of the data and methods that Beattie had used to value the subject property, the bank's chief appraiser sent a letter to Beattie dated February 14, 1996 that faulted the comparable sales data he had relied upon to arrive at his valuation of the subject property. The bank's appraiser concluded the letter by stating that "[i]n the aggregate, the data in this [appraisal] report combines to present such a misleading indication of the value of this property as to be considered fraudulent." The writer's opinion, however, was based upon disclosed, nondefamatory facts, including a seven-page memorandum enclosed with the letter that detailed the appraisal's perceived deficiencies. As a result, we hold that it did not constitute an actionable-defamatory communication. Hence, we affirm the Superior Court's entry of summary judgment in favor of defendants.

### Facts and Travel

After a homeowner asked Fleet Mortgage to refinance a residential-real-estate loan secured by a mortgage, the bank retained Beattie to appraise the property. Beattie was a self-employed real estate appraiser who worked as an independent contractor for various mortgage lenders. In addition to the land itself, the property consisted of a single-family, raised-ranch-style house located at 22 Gilbert Stuart Drive in Warwick (the subject property). Valuing the subject property at $350,000, Beattie submitted his appraisal to Fleet Mortgage on February 1, 1996. In arriving at this figure, Beattie selected and relied upon the recent sale prices of other properties in the area that he determined were comparable to the subject property. All these other properties, however, involved different types of homes that were located in other neighborhoods more than a mile away from the subject property. Thus, instead of choosing recent sales of raised-ranch houses like the subject property, Beattie relied upon sales involving colonial-style homes. And unlike the sub-

ject property, two of Beattie's comparable sales involved properties that enjoyed water views. Moreover, the other sales Beattie selected as comparables involved homes that were much larger, in terms of square footage, than the subject property.

Because a Fleet Mortgage loan processor had concerns about the accuracy and the quality of Beattie's appraisal, he referred it to a Fleet Mortgage staff appraiser for review. After examining Beattie's submission, this in-house staff appraiser prepared a seven-page memorandum dated February 9, 1996, that sharply criticized the grounds for Beattie's conclusions, particularly Beattie's selection of the comparable sales he had used to value the subject property. He then submitted his February 9 memorandum to Cornwell, Fleet Mortgage's chief appraiser.

After reviewing Beattie's appraisal and the February 9 memorandum from the Fleet Mortgage staff appraiser, Cornwell sent Beattie a letter dated February 14, 1996. The letter detailed the deficiencies Cornwell and Fleet Mortgage perceived in Beattie's appraisal, including four bullet-point statements that summarized Fleet Mortgage's primary criticisms concerning Beattie's report. The last paragraph of the letter began with the following statement:

> "In the aggregate, the data in this report combines to present such a misleading indication of the value of this property as to be considered fraudulent."

The letter concluded by asking Beattie to submit information that would justify his findings in light of the concerns identified by Fleet Mortgage about the accuracy of the data in his report. Cornwell also included with the letter a copy of the seven-page memorandum authored by Fleet

Mortgage's staff appraiser that set forth the alleged deficiencies in Beattie's report.

After he received and read Cornwell's letter and the accompanying memorandum, Beattie replied with a letter dated February 24, 1996. In his letter, Beattie speculated that Fleet Mortgage had to be working with some type of "informant" who "feared and despised him." In response to the bank's suggestion that the properties he had selected as comparables were worth much more than the subject property, Beattie queried, "[h]ow can $200,000+ Comps be used with a subject worth more than $300,000?" After Cornwell received Beattie's letter of February 24, 1996, he wrote back to Beattie on March 20, 1996, and informed him that because Fleet Mortgage did not agree with Beattie's "methodology, conclusions and value set forth in the appraisal," it had removed Beattie from the list of its approved real estate appraisers. After rejecting Beattie's appraisal, Fleet retained J.J. Burns and Gary Reilly to reappraise the subject property. Their appraisal, which was based in part on raised-ranch and split-level comparables situated closer to the subject property, valued the subject property at only $200,000 (compared with the $350,000 valuation of the Beattie report).

Ultimately, Beattie sued defendants Fleet National Bank, Fleet Mortgage, and Cornwell for the alleged defamatory statement about his appraisal in Cornwell's February 14, 1996 letter. In due course, defendants filed a motion for summary judgment asserting, inter alia, that the statement was not defamatory because it was merely the expression of a derogatory opinion that was based upon disclosed, non-defamatory facts.[1] A Superior Court motion justice granted defendants' motion, holding that:

> because he determined that an issue of material fact existed concerning the scope, extent, and necessity of the defendants' publication of the letter in question to persons other than the plaintiff.

---

1. Earlier, the defendants had moved for summary judgment on the grounds that their communication of the statement in question was privileged. However, a different Superior Court motion justice denied this motion

"Our Supreme Court has said that an impression or opinion based upon disclosed or assumed non-defamatory facts, no matter how unjustified and unreasonable or derogatory, shall not be sufficient to support a cause of action for defamation. I think this case falls squarely within that holding. The Court feels that this is a constitutionally protected opinion * * * ."

After the entry of a final judgment in favor of all defendants, plaintiff filed a timely notice of appeal.

## Analysis

■ In bringing this defamation action, Beattie bore the burden of proving, among other things, that defendants had communicated a "false and defamatory" statement about him. Whether the meaning of a particular communication is defamatory is a question of law for the court to decide rather than a factual issue for a jury to determine. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562, 587 (1989); *Gordon v. St. Joseph's Hospital,* 496 A.2d 132, 136 (R.I. 1985).

■ Even though there is no "wholesale defamation exemption for anything that might be labeled 'opinion,'" *see Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1, 17 (1990), nevertheless "a statement in the form of an opinion may be defamatory and therefore actionable if and only if 'it implies the allegation of undisclosed defamatory facts as the basis for the opinion.'" *Healey v. New England Newspapers, Inc.,* 555 A.2d 321, 324 (R.I.1989) (quoting *Belliveau v. Rerick,* 504 A.2d 1360, 1362 (R.I. 1986)). As a result, if the non-defamatory facts underlying an expressed derogatory opinion are publicly known or disclosed, the opinion, justified or unjustified, is privileged as a matter of law. *See Hawkins v. Oden,* 459 A.2d 481 (R.I.1983); *see* also *Belliveau,* 504 A.2d at 1362. Such a statement is privileged because "[w]hen the

facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as *insinuating* the existence of additional, undisclosed [defamatory] facts." *Standing Committee on Discipline v. Yagman,* 55 F.3d 1430, 1439 (9th Cir.1995) (emphasis added); *accord Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724, 728 (1st Cir.), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992) (statement alleging that a production was "fake" and "phony" held "unprovable, since those adjectives admit of numerous interpretations").

We have previously ruled that the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, protects the expression of opinions that are based upon disclosed, non-defamatory facts and prevents such statements from constituting actionable-defamatory communications. *See Belliveau,* 504 A.2d at 1362. In *Belliveau,* the defendant was the chairman of a college chemistry department who had submitted a memorandum to the vice president of the college stating his reservations about the proposed promotion of the plaintiff, an assistant professor. 504 A.2d at 1360–61. In the memorandum, the defendant explained that the plaintiff had not published except for a brief note in an in-house college bulletin. As a result, he concluded that: "[i]n my opinion Dr. Belliveau fails to meet major criteria for promotion to the rank of Associate Professor." *Id.* at 1361.

In *Belliveau,* we examined the defendant's memorandum in its entirety and concluded that the statement was based upon a disclosed four-page summary of the plaintiff's activities. Given those facts and the recognized privilege to express an opinion based upon disclosed, nondefamatory facts, we held that the defendant was entitled to summary judgment as a matter of law. *Id.* at 1363. We arrived at this decision after discussing the First Amend-

ment gloss on defamation claims arising from various United States Supreme Court pronouncements over the two decades since it decided the case of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). As we discussed in *Belliveau,*

"Although at common law an expression of opinion might have been actionable as defamatory in the event that such an expression was sufficiently derogatory of another to cause harm to his reputation, 3 Restatement (Second) *Torts* § 566 at 170–71 (1976), that rule now appears to have been rendered unconstitutional by the pronouncements of the Supreme Court of the United States in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In that case the Court observed:

'Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.' *Id.* at 339–40, 94 S.Ct. at 3007, 41 L.Ed.2d at 805." *Belliveau,* 504 A.2d at 1362.

The *Belliveau* Court endorsed § 566 of 3 Restatement (Second) *Torts* (1976) as embodying the proper rule governing defamation claims based upon the expression of an opinion. In doing so, we recognized that § 566 had been substantially modified after the United States Supreme Court had rendered its decision in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *See Belliveau,* 504 A.2d at 1362. As amended, § 566 provides as follows:

"A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." 3 Restatement (Second) *Torts* § 566 at 170.

As the reporter's notes to § 566 indicate, "[a] simple expression of opinion based on *disclosed* or assumed nondefamatory facts is not itself sufficient for an action of defamation, *no matter how unjustified and unreasonable the opinion may be or how derogatory it is." Id.* cmt. c at 173. (Emphasis added.) Relying upon these principles, we held in *Belliveau* that the opinion expressed by the defendant was not a defamatory communication.

Four years later, the United States Supreme Court decided *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). In *Milkovich,* a high school wrestling match deteriorated into a brawl between the two competing teams. *Id.* at 4, 110 S.Ct. at 2698, 111 L.Ed.2d at 8. Milkovich, the coach for one of the teams, later testified before a state high school athletic association about the incident, and answered questions concerning his alleged involvement in instigating the brawl. *Id.* After the athletic association placed the team on probation and declared it ineligible to compete during the next year, a number of parents filed suit to enjoin the athletic association's decision. *Id.* Milkovich was again called upon to testify about the incident. After listening to what a reporter characterized as Milkovich's "polished and reconstructed" account of the altercation, *id.* at 5 n. 2, 110 S.Ct. at 2698 n. 2, 111 L.Ed.2d at 9 n. 2, a Federal District Court judge ultimately granted the parents' request for an injunction. *Id.* at 4, 110 S.Ct. at 2698, 111 L.Ed.2d at 8. The reporter for the defendant newspaper, who had been present both at the wrestling match and at the athletic-association hearing (but not at the court hearing), wrote in his newspaper column that "[a]nyone who attended the meet * * * knows in his heart that Milkovich * * * lied at the [court] hearing after * * * having given his solemn oath to tell the truth." *Id.* at 5, 110 S.Ct. at 2698, 111 L.Ed.2d at 9. The article essentially asserted that the wrestling coach had committed perjury while testifying during a judicial proceeding. *Id.* at 4–5, 110 S.Ct. at 2698, 111 L.Ed.2d at 8–9.

In *Milkovich,* the United States Supreme Court cautioned that the dictum quoted above from *Gertz* was "merely a reiteration of Justice Holmes' classic 'marketplace of ideas' concept." *Id.* at 18, 110 S.Ct. at 2705, 111 L.Ed.2d at 17. Specifically, the Court declared that "this passage from *Gertz* was [not] intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Id.* The Court refused to create an unlimited exemption from defamation claims for statements couched in the form of "opinions" because the existing jurisprudence on the subject provided sufficient "'breathing space'" which "'[f]reedoms of expression require in order to survive.'" *Id.* at 19, 110 S.Ct. at 2706, 111 L.Ed.2d at 18 (quoting *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 772, 106 S.Ct. 1558, 1561, 89 L.Ed.2d 783, 790 (1986)). Moreover, the *Milkovich* Court stated that "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Id.* at 18–19, 110 S.Ct. at 2706, 111 L.Ed.2d at 18.

■ Nevertheless, the Court did not hold that all derogatory opinions based upon disclosed, nondefamatory facts were now actionable if the statement satisfies all of the other elements of a defamation claim. Rather, the Court gave two examples of opinions, the second of which it said would still receive full constitutional protection. The statement "In my opinion Mayor Jones is a liar," without more, could be considered defamatory if proven false. *Milkovich,* 497 U.S. at 19–20, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. On the other hand, the statement "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," according to the Court, "would not be actionable." *Id.* at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. It was the Court's conclusion that this second opinion did not contain a factual connotation capable of being proven false. *Id.* Especially in light of the status of the parties in *Milkovich*—a media defendant and a limited-purpose, public-figure plaintiff—such an opinion would not be actionable as a defamatory communication.[2] *Id.*

However, even though *Milkovich* dispelled the notion that the First Amendment protects all communications of opinions from defamation claims, it did not purport to disagree with § 566 of the Restatement (Second) *Torts* nor did it purport to control what the states may require for defamation claims to be actionable. *See, e.g., Mattel, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1160 (C.D.Cal.1998). Equally important, the facts in *Milkovich* obviated any need for the Supreme Court to address the critical distinction between communications covered by § 566 of the Restatement (Second) *Torts* (opinions based upon disclosed, nondefamatory facts) and the communications like the one it faced in that case (opinions based upon implied allegations of undisclosed, defamatory facts). The *Milkovich* majority held only that the communication in that case im-

2. We recognize that in this case Beattie is a private individual as opposed to a public official, a public figure, or a limited-purpose public figure. Therefore, the heightened degree of protection that would be afforded to a media defendant to express a derogatory opinion about Beattie's appraisal would not have been extended to protect these non-media defendants' statements concerning a private individual like Beattie. Thus, if this case had proceeded to trial, Beattie would not have been required to prove "actual malice" against these non-media defendants under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); that is, Beattie would not have been required to prove that defendants knew that this particular communication was false, or that defendants were guilty of recklessly disregarding whether the communication was false or true. However, the lesser culpability standard applicable when the plaintiff is a private person as opposed to some sort of a public figure is irrelevant when determining the defamatory character of the communication.

plied an assertion that the plaintiff had perjured himself in a judicial proceeding and that the assertion was one that was capable of being proven true or false by resorting to a comparison of the undisclosed transcripts of the athletic association hearing and those of the court hearing. *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19. Thus, the implied but undisclosed defamatory fact in *Milkovich* was the writer's implication that he was privy both to what Milkovich had testified to in court and at the athletic association hearing, and that, as a result, he knew that Milkovich had perjured himself. And, according to the writer, either one or both of these statements did not jibe with what the writer had witnessed first hand at the wrestling match. In his dissent, Justice Brennan helped to clarify this point:

> "Statements of belief or opinion are like hyperbole, as the majority agrees, in that they are not understood as actual assertions of fact about an individual, but they may be actionable if they *imply* the existence of false and defamatory facts." *Id.* at 25, 110 S.Ct. at 2709, 111 L.Ed.2d at 22 (Brennan, J., dissenting.)

It would appear, then, that *Milkovich* has not effectively overruled our decision in *Belliveau* insofar as we adopted the Restatement's position that an opinion is not defamatory if it is based upon disclosed, nondefamatory facts. Even though *Milkovich* stated that *Gertz* did not "create a wholesale defamation exemption for anything that might be labeled 'opinion,'" *id.* at 18, 110 S.Ct. at 2705, 111 L.Ed.2d at 17, the Court reaffirmed that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. Thus, post-*Milkovich* courts that have considered whether derogatory opinions are actionable as defamatory communications have consistently held that

"when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment. As the Fourth Circuit noted, 'because the bases for the * * * conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related.'" *Partington v. Bugliosi,* 56 F.3d 1147, 1156 (9th Cir. 1995) (quoting *Chapin v. Knight–Ridder,* 993 F.2d 1087 (4th Cir.1993)); *see also Nicosia v. De Rooy,* 72 F.Supp.2d 1093 (N.D.Cal.1999).

█  Moreover, even if *Milkovich* could be construed as overriding § 566 of the Restatement (Second) *Torts* (to the extent that this rule was inferred solely from the Court's prior First Amendment jurisprudence), our own Rhode Island Constitution affords adequate and independent grounds for us to afford "full constitutional protection" to this type of communication. *See* R.I. Const. art. 1, sec. 20 ("[t]he liberty of the press being essential to the security of freedom in a state, any person may publish sentiments on any subject, being responsible for the abuse of that liberty") and *id.* at sec. 21 ("[n]o law abridging the freedom of speech shall be enacted"). In this state, as a matter of law, we hold that a person does not abuse his or her state constitutional liberty of publishing sentiments on any subject if those sentiments are in the form of an opinion based upon disclosed, nondefamatory facts. To rule otherwise would be tantamount to judicial abridgment of free speech in Rhode Island. Living in a state founded by dissenters, symbolized by "the independent man," and still priding itself on its role in serving as the cradle of religious liberty in America, we are loath to adopt a rule that would retard the free flow of opinion and debate that has been so vital to our state throughout its history—especially when the communication in question concerned an issue like this one that touched upon a matter of public concern and that entailed ramifications extending well beyond the private

parties who happen to be involved in this particular dispute.[3]

Furthermore, a majority of other jurisdictions also protect the communication of similar types of opinions from defamation actions. For example, in *National Association of Government Employees, Inc. v. Central Broadcasting Corp.*, 379 Mass. 220, 396 N.E.2d 996 (1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980), the Massachusetts Supreme Judicial Court stated:

> "[I]f I write, without more, that a person is an alcoholic, I may well have committed a libel prima facie; but it is otherwise if I write that I saw the person take a martini at lunch and accordingly state that he is an alcoholic." *Id.* at 1001.

Similarly,

> "to describe a woman as a blackmailer, for example, might be to accuse her of a crime. But if there is first set forth an account of the underlying facts, a description of her dealings with a municipal agency relating to zoning negotiations, it becomes clear that the statement is but a hyperbolic form of opinion. Whether analyzed as a hyperbole or as a statement not provably false, the comment is not actionable." Sack, Robert D., *Sack on Defamation: Libel, Slander and Related Problems* § 4.3.2 (3rd Ed.1999); see also *Central Broadcasting Corp.*, 396 N.E.2d at 1000 (referring to plaintiff as a "communist" protected where basis for opinion was explicitly stated).

Thus, when determining the meaning of an allegedly defamatory statement, one must examine all parts of the communication that are heard or read with it. *Healey*, 555 A.2d at 326.

■ In this case, Cornwell's opinion that the data used in Beattie's appraisal combined to present such a misleading indication of the subject property's value "as to be considered fraudulent" was based on facts that he fully disclosed and explained in his letter to Beattie and in the accompanying seven-page memorandum that he enclosed with the letter.

> "[R]ead in context, they are not statements implying the assertion of objective facts but are instead interpretations of the facts available to both the writer and the reader. Thus, we join with the other courts of appeals in concluding that when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Partington*, 56 F.3d at 1156–57.

Conversely, Cornwell's opinion does not imply that he possessed or knew of other undisclosed and defamatory facts to support his opinion. For example, Cornwell explained that his greatest concern about the validity of the appraisal arose from Beattie's selection of the comparable sales because, in Cornwell's opinion, "far superior [comparable] sales existed in the neighborhood [of the subject property]." The subject property was a raised ranch located in the Heritage Park section of Warwick. Even though a split-level home and a raised-ranch house located within the subject property's Heritage Park development had recently sold, Beattie passed

---

3. Notably, the challenged communication in this case occurred in the aftermath of a devastating banking crisis in Rhode Island, *see generally*, *In re Advisory Opinion to the Governor (DEPCO)*, 593 A.2d 943 (R.I.1991), one that was fueled, in large part, by questionable real estate borrowing and unsound lending practices. These practices included the use of inflated real estate appraisals as the basis for obtaining and issuing shaky and undersecured loans that were ultimately defaulted upon when the borrowers were unable to repay according to the terms of the loans. Thus, even though the bank had an unquestionable private interest in making sure that the security for its loan was adequate, its communication of the challenged opinion in this case touched on an issue that, on a larger scale, had public interest ramifications beyond the private concerns of these parties.

over these potentially comparable sales and instead chose sales of different types of homes located in different neighborhoods as comparables.

Cornwell also disclosed that, in his opinion, plaintiff's valuation adjustments for the selected comparable sales ($10,000 for a bay or an ocean view in a $400,000 neighborhood and a $2,500 adjustment for a waterfront location) were grossly insufficient to adjust for these discrepancies. His letter also explained that he considered Beattie's "cost approach" to have been tremendously inflated in light of the then current value of the building materials in question.

The accompanying memorandum to Cornwell's letter also identified a series of perceived deficiencies in the Beattie appraisal that provided a largely factual, non-defamatory basis for Cornwell's opining—however unjustified or hyperbolic his ultimate conclusion may have been—that the data used in Beattie's report combined to present such a misleading indication of the subject property's value "as to be considered fraudulent." For instance, under the heading "Cost Approach," the memorandum stated:

"per square foot dollar amounts seem high per Marshall and Swift [a well-known valuation guide]. Normally homes with hollow core doors and [wall to wall] carpeting cost less than $75 [per square foot]. $63,000 for finished basement appears excessive."

Under the heading "Sales Comparison Analysis," the memorandum further stated:

"No verification sources listed for comps (ie [sic]: public record, county comps, etc.)"

" 'Comparables' are not reasonable due to great differences in size[,] location and amenities not to mention architectural style."

"Comments section inadequate. * * * No explanations are given for adjustments."

In the "Reconciliation" section of the memorandum, the Fleet Mortgage staff appraiser wrote:

"conditions of appraisal section does not refer to conditions of appraisal."

Finally, in the "Addenda" section of the memorandum, the staff appraiser stated:

"Comparables over 1 mile comment does not seem supportable due to adequate available data in the subjects [sic] immediate market area."

"Styles of homes used comment does not appear reasonable due to similar style homes which have recently sold in the immediate area."

"Location map * * * does not adequately indicate individual streets."

The above-referenced assertions in the Fleet's staff appraiser's memorandum attached to the Cornwell letter are not themselves the subject of this litigation. As Justice Brennan explained in his *Milkovich* dissent,

"if the speculative conclusion is preceded by stated factual premises, and one or more of them is false and defamatory, an action for libel may lie as to them [as to the stated factual premises that are false and defamatory]. But the speculative conclusion itself is actionable only if it implies the existence of another false and defamatory fact." *Id.* at 28 n. 5, 110 S.Ct. at 2710 n. 5, 111 L.Ed.2d at 24 n. 5. (Brennan, J., dissenting.)

In sum, Cornwell's one-page letter and seven-page attachment set forth in detail the factual grounds for his opinion that the data used in Beattie's appraisal "present[ed] such a misleading indication of the value of this property as to be considered fraudulent." If Cornwell had written a letter to Beattie that merely stated, without explanation, "The data used in your appraisal are, in my opinion, fraudulent," his use of the word "fraudulent" may have been actionable as a defamatory communication because it could have been reasonably construed to imply the existence of undisclosed defamatory facts. *See Healey,*

555 A.2d at 324. However, the facts and premises underlying Cornwell's opinion—however misleading, incomplete, or erroneous those facts and premises may have been—were fully disclosed in his letter to Beattie and in the attachment thereto. As a result, Cornwell's characterization of the data used in Beattie's appraisal as "present[ing] such a misleading indication of the value of this property as to be considered fraudulent"—even if it amounted to a hyperbolic, unjustified, and derogatory opinion—was not an actionable-defamatory statement. *See Moldea v. New York Times Co.*, 22 F.3d 310, 316–17 (D.C.Cir. 1994) (criticism of an author's "sloppy journalism" and unprofessional techniques held not actionable under *Milkovich* because statements "were not so obviously false as to sustain a finding of actual malice").

▮ Moreover, because Cornwell's letter expressly relied upon four bullet-point primary concerns about Beattie's appraisal and included the complete underlying memorandum upon which he based his above-stated opinion, the letter did not contain statements that implied the existence of undisclosed facts that were "provable as false." *Milkovich*, 497 U.S. at 19, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. And even though Cornwell used the word "fraudulent," in light of the disclosed bases for this opinion such a conclusory characterization was merely "nonactionable rhetorical hyperbole," a mere vigorous epithet that summarized why, for the reasons that were fully disclosed to Beattie, Cornwell obviously considered Beattie's appraisal to have reached a valuation conclusion that was far outside the range of a reasonable fair-market value for such a property. *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir.1995). And while some jurisdictions have held that there is no protection for "accusations that an individual has committed a crime or is personally dishonest," *Gregory v. McDonnell Douglas Corp.*, 17 Cal.3d 596, 131 Cal. Rptr. 641, 552 P.2d 425, 430 (1976), Cornwell's use of what amounted to a hyperbol-

ic opinion to sum up what the disclosed facts and premises in his letter suggested to him about the data Beattie had used in his appraisal could not be construed reasonably to suggest that Beattie himself had actually committed a fraudulent act based upon certain nondisclosed, defamatory facts that were only within the writer's purview. As a result, the trial justice correctly concluded that Beattie was not entitled to maintain a cause of action for defamation. *See id.*; *Belliveau*, 504 A.2d at 1362; *Hawkins*, 459 A.2d at 484; *see also* Restatement (Second) *Torts* § 566 cmt. c at 173 (stating that "[a] simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is").

▮ Nevertheless, Beattie argues that the Superior Court improperly granted summary judgment because an issue of material fact remained concerning whether Cornwell had sufficient information to assert that the data used in his appraisal report could be considered fraudulent. According to *Milkovich*, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." 497 U.S. at 18–19, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. But here, Cornwell's letter does not imply any false assertion of fact based upon disclosed facts that were incorrect or incomplete. Nor does it imply any false assertion of fact based upon Cornwell's erroneous assessment of these disclosed facts. On the contrary, the challenged statement in the letter is unquestionably one of an opinion that, in light of the disclosed facts in the letter, does not imply a false assertion of fact. And whether Cornwell possessed sufficient information to afford his opinion constitutional protection is a question of law, not of fact. *See Harte–Hanks Communica-*

*tions, Inc.*, 491 U.S. at 685, 109 S.Ct. at 2694, 105 L.Ed.2d at 587; *see also Campanelli v. Regents of the University of California*, 44 Cal.App.4th 572, 51 Cal. Rptr.2d 891, 894 (1996).

Further, plaintiff's argument that a genuine issue of material fact exists is not supported by the record. In arguing that there is a "contradiction" between Cornwell's deposition testimony and that of other Fleet personnel who were deposed or who testified during pretrial proceedings, Beattie attempted to juxtapose Cornwell's deposition testimony with a summary of the purported testimony of Cornwell and other Fleet witnesses at a *Palmisano* hearing,[4] yet the transcripts of this testimony were not presented to the Superior Court justice who decided the summary-judgment motion, nor to this Court. Accordingly, Beattie cannot create an issue of fact on appeal by providing his own summary of various witnesses' purported testimony in connection with a *Palmisano* hearing that was neither part of the record before the motion justice nor stipulated to by defendants at that time.

As a result, even when viewing the record in the light most favorable to Beattie, the motion justice was entitled to conclude that there were no genuine issues of material fact to be resolved. As the party opposing the motion for summary judgment, Beattie bore the burden of proving via competent evidence the existence of a material factual dispute. *Bourg v. Bristol Boat Co.*, 705 A.2d 969, 971 (R.I.1998); *see also Berarducci v. Rhode Island Hospital*, 459 A.2d 963, 964 (R.I.1983) (holding that arguments of counsel are no substitute for counter affidavits of fact in opposing a motion for summary judgment).

Although Beattie vehemently disputed the propriety of defendants' reliance upon the disclosed facts in Cornwell's letter to

justify the derogatory opinion expressed therein, he was unable to dispute the fact that Cornwell actually relied upon this disclosed data and the other material presented with the letter in formulating the opinion that Beattie contended was defamatory. Moreover, Cornwell's deposition testimony failed to raise a genuine issue of material fact about the nature of the information upon which he relied in rendering his opinion about Beattie's appraisal. *See Gordon*, 496 A.2d at 136–37 (R.I.1985). Cornwell's deposition testimony indicated that he wrote the allegedly defamatory letter after (1) a discussion with a Fleet Mortgage staff appraiser, (2) a review of Beattie's appraisal of the subject property and his attached curriculum vitae, and (3) a review of the Fleet Mortgage staff appraiser's February 9 memorandum with attached schedules of comparable properties. Despite Beattie's speculations about the existence of an informer who hated him, the motion justice was presented with no evidence to controvert Cornwell's testimony concerning the information upon which he relied in stating his opinion. As a result, plaintiff failed to show that any genuine issues of material fact precluded summary judgment on this issue.

Finally, viewing Cornwell's letter in the context of the business relationship between the parties further supports the conclusion that his letter was a nonactionable statement of opinion. Before completing this particular appraisal, Beattie had performed other appraisals for Fleet Mortgage from time to time on an as-requested basis. In doing so, he worked as an independent contractor. He was never an employee of Fleet Mortgage, nor did he have any express or implied contract with Fleet Mortgage to furnish him with appraisal work. As a result, Fleet Mortgage had

---

**4.** In *Palmisano v. Toth*, 624 A.2d 314, 320–21 (R.I.1993), we held that a plaintiff seeking discovery before trial of a defendant's financial resources in connection with a punitive damages claim must first make a prima facie showing at a pretrial hearing that the case warrants punitive damages. However, we decline Beattie's invitation to review the propriety of the Superior Court's order granting Fleet's request for a *Palmisano* hearing in this case because it is irrelevant to the outcome of this appeal.

the option, at any time, to stop sending appraisals to him and to terminate their relationship.

Thus, Fleet Mortgage could have simply rejected Beattie's appraisal, and without explanation or notice, never given Beattie another appraisal assignment. Instead, Cornwell decided to explain and disclose to Beattie the factual bases for his critical opinion of Beattie's valuation of the subject property. And even though we acknowledge and appreciate the alleged practical significance of why Fleet Mortgage ostensibly gave Beattie the opportunity to respond to its criticisms instead of simply terminating their relationship when it received his appraisal (it supposedly wanted Beattie to complete his other pending appraisal assignments for the bank before ending its relationship with Beattie), this asserted explanation for the bank's conduct is simply irrelevant for purposes of analyzing whether the challenged statement in Cornwell's letter to Beattie was an actionable-defamatory communication.

## Conclusion

In appealing the summary judgment in favor of the defendants, Beattie essentially asks this Court to allow a jury to "correct" Cornwell's derogatory opinion of his appraisal and to punish defendants for their respective roles in allowing him to communicate this statement. We decline to do so, however, because this type of communication constituted an opinion based upon disclosed, nondefamatory facts. Mindful that, in such circumstances, "[w]e can never be sure that the opinion we are endeavoring to stifle is a false opinion; and even if we were sure, stifling it would be an evil still," [5] we deny the appeal and affirm the Superior Court's entry of summary judgment for the defendants.

---

**5.** John Stuart Mill, *On Liberty* 34 (Gryphon Editions 1992) (1859).