Gerald A. LEDDY

v.

NARRAGANSETT TELEVISION, L.P., et al.

No. 2001–484–Appeal.

Supreme Court of Rhode Island.

March 22, 2004.

Charles Nystedt, Esq., Providence, for Plaintiff.

William P. Robinson, III, Providence, for Defendant.

Present: WILLIAMS, C.J., and FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

FLANDERS, Justice.

As the television cameras roll, an investigative reporter, inquiring about an issue of potential public interest, thrusts a microphone into the startled, hapless face of some speedwalking employee, who is vainly attempting to short circuit the interview. How often has this all too familiar scene of "ambush journalism" played itself out on television news shows and on other similar programs?

This case concerns a defamation action filed in response to such an investigative report that a local television station broadcast in 1992 during its nightly newscast. As part of that report, the station included a segment showing a television reporter questioning plaintiff, Gerald A. Leddy

(plaintiff), a deputy fire marshall who was working as a fire investigator for the State Fire Marshall's Office at that time. The station aired the interview with plaintiff during the second installment in a three-day-long series of broadcasts. The series showcased municipal disability pensions paid to former City of Providence (city) firefighters and police officers, such as plaintiff. After qualifying for disability pensions and retiring from their jobs with the city, these officers worked at other government jobs for a full-time salary while also collecting their municipal disability pensions.

### Facts and Travel

The plaintiff appeals from the entry of a Superior Court summary judgment in favor of defendants, Narragansett Television, L.P.,[1] Narragansett Television, Inc., NCP Television Invest (collectively Channel 12), and a Channel 12 reporter, Vincent DeMentri (DeMentri). He contends that the motion justice erred in concluding that he was a public official when Channel 12 broadcast the interview and that, therefore, he was required to prove actual malice on Channel 12's part in televising the challenged statements. The plaintiff also contends that Channel 12's actions in broadcasting the interview and a later promotional spot showing a brief segment of the interview reveal actual malice on its

part. More specifically, plaintiff asserts that certain terms and words that Channel 12 used in the challenged broadcasts—namely, "ripping off" and "wrong"—were capable of bearing a defamatory meaning, thereby precluding summary judgment. The plaintiff additionally argues that the motion justice erred in granting summary judgment in favor of Channel 12 on his statutory claim alleging unauthorized use of his picture under G.L.1956 § 9–1–28 ("Action for unauthorized use of name, portrait, or picture.").

In 1975, while he was working as a city firefighter, plaintiff injured his wrist in the line of duty. Because of his injury, plaintiff retired as a firefighter in 1977 and qualified for a disability pension. In that same year, however, plaintiff secured full-time employment with the State Fire Marshal's Office. At the time of Channel 12's 1992 broadcasts, plaintiff was one of only four deputy fire marshals acting as fire investigators for the state. Thus, plaintiff was receiving a full-time government salary for serving as a state fire investigator while he was also receiving a tax-free disability pension from the city as a retired municipal firefighter.

In July 1992, Channel 12 broadcast the three-part investigative series in question, focusing on disability pensions received by former city firefighters and police officers.[2]

---

1. At the time of the incidents in question, Narragansett Television L.P., owned and operated WPRI Channel 12 Television. Vincent DeMentri was a Channel 12 reporter who participated in one of the challenged broadcasts. The other named defendants were affiliates of Narragansett Television, L.P.

2. The following text is from the second broadcast in the three-part series that aired for three consecutive nights—one segment per night—during which Channel 12 interviewed plaintiff:

"Karen Adams [Channel 12 news anchor]: Disability pensions for Providence. firefight-

ers and police—is it a system that needs fixing? Last night in his special report, "What A Deal," Target 12 reporter Vince DeMentri explained the tax-free disability benefits. He also told you the shocking number of police and firefighters on the disability payroll. We want to again make it clear our report looks into a system some say needs fixing. We are not implying those who have taken disability pensions have done anything wrong, and none of the people we'll show you broke any laws. And we're not questioning whether or not these people have legitimate medical concerns. Tonight you'll meet some of those former

During the broadcast interview with plaintiff, Channel 12's reporter, DeMentri, asked plaintiff: "Do you feel like you're ripping off the system in some way, because you really, pardon, no offense, but you don't look that handicapped." The plaintiff's face was clearly visible in the interview portion of the broadcast. Although plaintiff refused an "on-the-record" interview, he did agree, through his attorney, to discuss the matter off the record. Channel 12, however, declined this offer, and it also did not review plaintiff's medical records before it broadcast this report.

Later, in January and February of 1993, Channel 12 aired promotional spots for its investigative reporting team during which plaintiff's televised image from the 1992 broadcast briefly appeared. During these promotional broadcasts—containing a brief soundless clip showing, among other images, DeMentri questioning plaintiff—a background voice stated, "Hey. It's simple. If you don't want these guys in your face, don't do anything wrong."

As a consequence of these two broadcasts, plaintiff sued Channel 12 in 1993 for, *inter alia*, defamation and unauthorized use of his picture under § 9–1–28. After many years of discovery, this case came

before a Superior Court motion justice on the parties' cross-motions for summary judgment. In a bench decision, the motion justice ruled that plaintiff was a public official at the time of the interview, and, therefore, he was required to prove actual malice on Channel 12's part under the legal test governing defamation actions against public officials, as set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The court concluded that plaintiff was a public official because his work as a fire investigator potentially affected the constitutionally protected liberty and property interests of various individuals. Law-enforcement officials, the motion justice noted, relied on the reports of such investigators to prosecute arson and other related crimes. Recalling that in *Hall v. Rogers*, 490 A.2d 502, 504 (R.I.1985), this Court held that the police officers in that case qualified as public officials, the motion justice analogized deputy fire marshals to police officers with respect to the nature of their powers and to the high public scrutiny under which they function. The motion justice also decided that the subject of pensions for disabled municipal firefighters—who thereafter serve as deputy fire

cops and firefighters on disability who are working other jobs, and it's all perfectly legal.

"Vince DeMentri [Channel 12 investigative reporter]: Imagine a disability system that allows its pensioners to work other jobs while collecting tax-free money from the city. Not only is it legal in Providence, but the fact of the matter is the majority of former cops and firefighters we tracked down are working state jobs similar to the ones they left in the city. Take Donald Burn and Gerald Leddy for example, both legally work for the State Fire Marshal's Office and both are on disability from the Providence Fire Department. Burn, who is collecting disability for a job-related nerve condition refused to talk to us. However, we caught up with Gerald Leddy at the

State Fire Marshal's Office. Leddy left the Fire Department on a disability pension because of an on-the-job wrist injury.

"DeMentri to Leddy: Do you feel like you're ripping off the system in some way, because you really, pardon, no offense, but you don't look that handicapped. Wasn't there something you could do within the Providence Fire Department that you're doing here?

"Leddy: It's possible.

"DeMentri: How come you're not doing it?

"Leddy: Uh, you'll have to talk to my attorney about this, okay?

"DeMentri: Who's your attorney?

"DeMentri: We offered to talk with Mr. Leddy and his attorney for an on-the-record interview. But this letter from his attorney refused our request."

marshals for the state—was a matter of legitimate public concern.

Next, the motion justice determined that plaintiff had not introduced any evidence into the record indicating that defendants acted with actual malice. He discerned no factual support for the suggestion that defendants had broadcast their communications with actual knowledge of a falsehood or with reckless disregard for the truth. He noted that Channel 12 had run disclaimers at the beginning of each of the three broadcasts in this particular series on disability pensions and that the station had offered to let plaintiff tell his side of the story on the record. He further ruled that the words "ripping off" and "wrong" were not verifiably defamatory in this context. According to the motion justice, the words had "a host of connotations, some quite pejorative and others relatively benign."

With respect to plaintiff's claim alleging unauthorized use of his picture, the court decided that the station's brief use of a televised clip of plaintiff's 1992 interview segment during the broadcast of Channel 12's 1993 promotional spot for its investigative reporting team was privileged as a matter of law as an incidental use because plaintiff was a public official and the media have a constitutionally protected right to "disseminate news about public officials in matters of public concern."

Consequently, the court granted defendants' motion for summary judgment, denied plaintiff's motion, and entered an order granting summary judgment for defendants on all counts.

■ On appeal, this Court will uphold a trial justice's grant of summary judgment when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Heflin v. Koszela*, 774 A.2d 25, 29 (R.I.2001). To demonstrate the existence of an issue of material fact, the nonmoving party cannot rely solely on allegations in the pleadings. *Id.* Although both parties agree that the facts in this case were largely undisputed, they disagree about whether the motion justice correctly applied the controlling law to these facts.

## Analysis

■ The first issue on appeal concerns whether plaintiff was a public official when the first of the two broadcasts in question appeared on Channel 12's televised news program. In *Hall*, 490 A.2d at 504, this Court held that the two police officers in that case were public officials. The Court quoted the test set out in *Rosenblatt v. Baer*, 383 U.S. 75, 85–86, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), which specified that a public official has or appears " 'to the public to have, substantial responsibility for or control over the conduct of governmental affairs,' " and his or her position " 'has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees * * *.' " *Hall*, 490 A.2d at 504 (quoting *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir.1981) and *Rosenblatt*, 383 U.S. at 85, 86, 86 S.Ct. 669). The *Hall* Court concluded that because a police officer possesses the authority to exercise force and deprive people of their freedom, such governmental power warranted a vigorous and open discussion under the First Amendment to the United States Constitution concerning police officers' performance and qualifications. *See id.*

Scant case law exists on whether courts should accord firefighters or fire investigators such "public official" status. In *Jones v. Palmer Communications, Inc.*, 440

N.W.2d 884, 895 (Iowa 1989), the Iowa Supreme Court decided that a "low-ranking" firefighter was not entitled to public-official status because he did not have substantial responsibility for or control over the conduct of governmental affairs. But in *Miller v. Minority Brotherhood of Fire Protection,* 158 Wis.2d 589, 463 N.W.2d 690, 695–96 (1990), the Wisconsin intermediate appellate court held that a firefighter with the rank of captain was entitled to the designation of "public official" under the *New York Times Co.* defamation rubric. The Wisconsin court stated that a public official need not be a policymaker. *Id.* at 695. It decided that the fire captain in that case was a public official because he wielded considerable power over his firehouse and enjoyed considerable discretion in using that power. *Id.* at 695–96.

The plaintiff fire investigator in this case falls somewhere between the hierarchical rankings of the two firefighter positions that were at issue in the above-cited cases. The plaintiff certainly possessed more authority and discretion than the "low ranking" firefighter in *Jones,* but perhaps not the same level of authority as the fire captain in *Miller.* Although a fire investigator has a strong law-enforcement dimension to his job, wields considerable power in connection with the inspections he performs, and enjoys considerable discretion in using that power, we shall assume, without deciding, that the public-official designation would not apply to plaintiff in this case. In doing so, we note in passing that, even though the power and responsibility of plaintiff's position as a fire investigator may be comparable in various respects to the police officers in *Hall,* the challenged portions of the two broadcasts in question had little or nothing to do with his qualifications for or his performance of his job as a fire investigator. To be sure, as the relatively recent and devastating West Warwick nightclub fire has revealed, the public certainly has a special interest in the work of those government employees, such as plaintiff, who conduct fire investigations. But these broadcasts did not question his fitness for this position, his job performance as a fire investigator, or his ability to do that job. Rather, the focus of the broadcasts was on the propriety of awarding disability pensions to former municipal public-safety officers, such as plaintiff, who then receive a salary on top of their disability pension for working another full-time government job, such as serving as a fire investigator for the state.

Thus, after viewing and reviewing the videotapes of the broadcasts in question, including the investigative interview with plaintiff, we shall assume, *arguendo,* that, for the purpose of analyzing the alleged defamatory nature of the challenged broadcasts, plaintiff was not a public official. Nevertheless, we still conclude that, as a matter of law, defendants did not communicate any false statements about plaintiff or imply the existence of any defamatory facts about him. Channel 12's disclaimer at the beginning of the broadcast expressly stated that the news report in question was not implying that plaintiff had done anything illegal. It also said that Channel 12 was not questioning whether plaintiff had experienced any legitimate medical problems. Moreover, even though the reporter asked plaintiff if he felt like he was "ripping off" the system because he did not "look that handicapped," it was clear from the context of those statements that the reporter was not insinuating that plaintiff was malingering or faking his disability. Rather, the report merely questioned plaintiff's receiving and the city's granting of disability pensions to former city employees, such as plaintiff, who, notwithstanding their disability, still managed to earn a full-time salary by

working at another important government job while also receiving their municipal disability pensions.

In this context, the thrust of the reporter's questioning related to why plaintiff could not have worked in a similar lighter-duty position with the city, just as he was doing with the state, without also receiving a municipal disability pension. Furthermore, asking people whether they *feel* as if they are doing something that may be inappropriate or questionable from a public-policy standpoint—such as, "ripping off" the system by collecting a government-paid salary on top of a municipal disability pension—is not the same thing as accusing them of criminal or moral wrongdoing. This is especially so because Channel 12 fully disclosed during the broadcast the nondefamatory factual basis for the derogatory words used in the challenged communication, together with an appropriate disclaimer negating any unintended insinuation of illegality against plaintiff or any of the other beneficiaries of this practice. Given these circumstances, to hold that Channel 12's treatment of "a system some say needs fixing" subjected itself to liability for defamation would create the very chilling effect on the legitimate criticism of government policy that the United States Supreme Court condemned in *New York Times Co.*, 376 U.S. at 279, 84 S.Ct. 710.

■■■ "Whether the meaning of a particular communication is defamatory is a question of law for the court to decide rather than a factual issue for a jury to determine." *Beattie v. Fleet National Bank*, 746 A.2d 717, 721 (R.I.2000). "A defamation action requires a plaintiff to prove '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher;' and (d) damages,

unless the statement is actionable irrespective of special harm." *Swerdlick v. Koch*, 721 A.2d 849, 859–60 (R.I.1998) (quoting *Healey v. New England Newspapers, Inc.*, 555 A.2d 321, 324 (R.I.1989)). Applying these standards, we hold that the broadcast of this investigative report was not defamatory because, at worst, it constituted the expression of a derogatory opinion about a subject of legitimate public interest: namely, plaintiff's conduct in applying for and receiving a municipal disability pension while he also was getting paid for working as a full-time fire investigator in another government job. Moreover, the broadcast fully and expressly disclosed to its viewers the nondefamatory factual basis for that opinion, while it expressly disclaimed possible defamatory connotations.

■■■ The principle of "fair comment" affords legal immunity to the honest expression of opinions on matters of legitimate public interest when such opinions are based upon true statements of fact. *See* 2 Fowler V. Harper et al., *The Law of Torts* § 5.8 at 67 (2d ed.1986). In *New York Times Co.*, 376 U.S. at 292, n. 30, 84 S.Ct. 710, the United States Supreme Court held that "a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact." Here, Channel 12's implied opinion that plaintiff was "ripping off the system" by accepting a tax-free disability pension while collecting a salary for working at a full-time job constituted fair comment on a matter of public interest, based on the disclosed and nondefamatory fact that plaintiff was collecting a municipal disability pension while working as a fire investigator for the state. Although such a fair-comment defense can be overcome if the plaintiff can prove, with convincing clarity, that the defendants acted with actual malice—that is, with knowledge that the challenged statement was

false or with reckless disregard for its truth, *see New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. 710—no evidence suggested that Channel 12 acted in such a culpable manner. "[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Beattie*, 746 A.2d at 724 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). In addition, "a person does not abuse his or her state constitutional liberty of publishing sentiments on any subject if those sentiments are in the form of an opinion based upon disclosed nondefamatory facts." *Beattie*, 746 A.2d at 724.

■■■■ Nevertheless, sometimes a statement with essentially true facts can imply a false, defamatory meaning. *See White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C.Cir.1990). The plaintiff argues that the communications in question here contained such defamatory implications. But to support such an implication, the communication of essentially true facts must, by its particular manner or language, supply affirmative additional evidence that defendants intended to or actually endorsed the defamatory inference. *Id.* at 520. Here, defendants' disclosure of the nondefamatory facts that formed the basis for the derogatory opinion in the broadcast, together with Channel 12's express disclaimers, showed that they did not intend any defamatory inference to be drawn from the broadcast. Therefore, even if the 1992 broadcast could be construed to constitute a derogatory opinion about what this plaintiff was doing, the broadcast disclosed the nondefamatory factual basis for the derogatory words in question. Absent any evidence to contradict the disclaimer or to suggest that it was a sham, the disclaimer language in the broadcast, coupled with the disclosure of the underlying factual basis for the derogatory words, showed that Channel 12 did not defame plaintiff.

■■■■ The 1993 promotional spot, on the other hand, contained no such express disclaimers. A brief glimpse of Channel 12's reporter interviewing plaintiff appeared during this broadcast, in which a voice-over told the listener that if the viewers wished to avoid talking to investigative reporters, "don't do anything wrong." Nevertheless, certain words—and "wrong" is one of them—are too imprecise and vague to be verifiable as either true or false, and therefore, they are not actionable as a potentially defamatory communication. *See, e.g., McCabe v. Rattiner*, 814 F.2d 839, 842–43 (1st Cir.1987) (word "scam" not precise enough to convey defamatory meaning). "Some words or phrases evoke a multiplicity of meanings; others do not. Under the aegis of the First Amendment, a particular word or phrase ordinarily cannot be defamatory unless in a given context it reasonably can be understood as having an easily ascertainable and objectively verifiable meaning." *Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir. 1997).

Here, we hold that Channel 12's mere use of the word "wrong" in the promotional spot admonishing viewers not to "do anything wrong" if they did not want to speak to Channel 12's investigative reporters—even when coupled with the clip briefly showing a Channel 12 reporter interviewing plaintiff—was too imprecise and vague to support plaintiff's defamation claim because such a statement cannot be proven true or false. Especially in light of the previous broadcasts, from which defendant excerpted the clip showing DeMentri's questioning of plaintiff, the word "wrong" in this context merely referred to the city's policy of awarding (and plaintiff's

conduct in applying for and accepting) disability pensions to public-safety officers who still were able to work full-time—albeit in lighter-duty jobs—for the state government. Thus, in context, Channel 12 used "wrong" in the promotional spot in the sense of "it ought not to be the case," thereby conveying its derogatory opinion of and its adverse commentary about this particular public policy and about plaintiff's taking advantage of that policy. But even if we view the promotional broadcast in isolation, the connection of the word "wrong" to this plaintiff was not explicit, nor was Channel 12's use of that word capable of verification as either a true or false statement. In any event, whether viewed in isolation or in the overall context of the previous broadcasts themselves, Channel 12's challenged use of the word "wrong" was too imprecise and vague to subject the author of the statement in question to a potential liability for defamation vis-à-vis this plaintiff.

Finally, plaintiff asserts that the motion justice erred in granting summary judgment to defendants on plaintiff's claim under § 9–1–28 for unauthorized use of his picture. To establish a statutory claim for unauthorized use of a person's picture, a plaintiff must establish that his picture was used without his written permission for trade or advertising purposes. *Mendonsa v. Time, Inc.*, 678 F.Supp. 967, 971 (D.R.I.1988) (interpreting § 9–1–28). Essentially, the plaintiff must demonstrate that the defendant commercially exploited him without his permission. *Id.* Although the promotional spot in this case undoubtedly included a commercial aspect in attempting to attract viewers to Channel 12's future news broadcasts, courts have ruled that free-speech considerations protect brief rebroadcasts of previously televised investigative reports or other newsworthy events to promote a news medium

from such invasion-of-privacy or wrongful-use claims—so long as the original broadcast itself was not false or defamatory. *See, e.g., Montana v. San Jose Mercury News, Inc.*, 34 Cal.App.4th 790, 40 Cal. Rptr.2d 639, 642 (1995); *Namath v. Sports Illustrated*, 48 A.D.2d 487, 371 N.Y.S.2d 10, 12 (N.Y.App.Div.1975). In *Velez v. VV Publishing Corp.*, 135 A.D.2d 47, 524 N.Y.S.2d 186, 187 (N.Y.App.Div.1988), the court held that such a promotional use "is a necessary and logical extension of the clearly protected editorial use of the content of the publication." Furthermore, the court noted that "the incidental use in an advertisement by a news disseminator of a person's name or identity does not violate the statutory proscription, if it had previously published the item exhibited as a matter of public interest." *Id.* at 187–88 (discussing *Booth v. Curtis Publishing Co.*, 15 A.D.2d 343, 223 N.Y.S.2d 737, 741 (N.Y.App.Div.1962)). *See also Montana*, 40 Cal.Rptr.2d at 642. Applying this reasoning, a news medium such as Channel 12 has a constitutional privilege to tout itself in promotional spots or advertisements by showing brief rebroadcasts or televised snippets from its past nondefamatory reports or from its coverage of news stories.

We agree, and, therefore hold that the motion justice did not err in granting summary judgment on this statutory claim for unauthorized use of his picture.

Finally, although we are mindful that "[t]he liberty of the press is most generally approved when it takes liberties with the other fellow, and leaves us alone," Edgar W. Howe, *Country Town Sayings*, 198 (1911), nevertheless, in light of the free-speech considerations at issue in this case, we consider the legal questions raised "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New*

*York Times Co.,* 376 U.S. at 270, 84 S.Ct. 710. "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). And even though we carry no brief for the disreputable aspects of "ambush journalism"—especially when the media focus their attention on relatively low-level government employees and others who do not deserve to bear the brunt of such base antics—it is not our place to serve as the censors of journalistic discretion, so long as the media do not overstep those broad constitutional lines between which they are allowed considerable room to maneuver.[3] *See Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1304 (8th Cir.1986).

Ultimately, it is still true that, in a free society such as ours, "in order to enjoy the inestimable benefits which the liberty of the press ensures, it is necessary to submit to the inevitable evils which it engenders." Alexis de Tocqueville, 1 *Democracy in America,* 184 (rev. ed., translated by Henry Reeve, Colonial Press 1900).

### Conclusion

For these reasons, we affirm the summary judgment for the defendants.

---

**3.** "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press. It has accordingly been decided, by the practice of the states, that it is better to leave a few of its noxious branches to their luxuriant growth, than, by pruning them away, to insure the vigor of those yielding the proper fruits." James Madison, *Reports on the Virginia Resolutions,* 1799–1800, *in* 4 *Debates of the Several State Conventions on the Adoption of the Federal Constitution* 571 (Jonathan Elliot, 2d rev. ed. 1836).